PIPER ET AL. *v.* CHRIS-CRAFT INDUSTRIES, INC.

No. 75–353.   Argued October 6, 1976—Decided February 23, 1977*

---

*Together with No. 75–354, *First Boston Corp.* v. *Chris-Craft Industries, Inc.*, and No. 75–355, *Bangor Punta Corp. et al.* v. *Chris-Craft Industries, Inc.*, also on certiorari to the same court.

1

2

BURGER, C. J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, POWELL, and REHNQUIST, JJ., joined. BLACKMUN, J., filed an opinion concurring in the judgment, *post*, p. 48. STEVENS, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 53.

*Paul G. Pennoyer, Jr.,* argued the cause for petitioners in No. 75–353. With him on the briefs was *Zachary Shimer. David W. Peck* argued the cause for petitioner in No. 75–354. With him on the briefs were *Arthur H. Dean, John F. Arning, John L. Warden, Charles W. Sullivan,* and *Louis Loss. Lloyd N. Cutler* argued the cause for petitioners in No. 75–355. With him on the briefs were *Manuel F. Cohen, Louis R. Cohen, Stephen F. Black, William T. Lake, Michael S. Helfer, William J. Kolasky, Jr., James V. Ryan, Roger L. Waldman, Charles Alan Wright, Dudley C. Phillips,* and *John J. Martin.*

*Arthur L. Liman* argued the cause for respondent in all three cases. With him on the brief were *Simon H. Rifkind, Stuart Robinowitz,* and *Jack C. Auspitz.*†

—————

†*Harvey L. Pitt* and *David Ferber* filed a brief for the Securities and Exchange Commission as *amicus curiae* urging affirmance in all cases.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari in these cases, 425 U. S. 910 (1976), to consider, among other issues, whether an unsuccessful tender offeror in a contest for control of a corporation has an implied cause of action for damages under § 14 (e) of the Securities Exchange Act of 1934, as added by § 3 of the Williams Act of 1968, 82 Stat. 457, 15 U. S. C. § 78n (e), or under Securities and Exchange Commission (SEC) Rule 10b–6, 17 CFR § 240.10b–6 (1976), based on alleged antifraud violations by the successful competitor, its investment adviser, and individuals constituting the management of the target corporation.

I

*Background*

The factual background of this complex contest for control, including the protracted litigation culminating in the cases now before us, is essential to a full understanding of the contending parties' claims.

The three petitions present questions of first impression, arising out of a "sophisticated and hard fought contest" for control of Piper Aircraft Corp., a Pennsylvania-based manufacturer of light aircraft. Piper's management consisted principally of members of the Piper family, who owned 31% of Piper's outstanding stock. Chris-Craft Industries, Inc., a diversified manufacturer of recreational products, attempted to secure voting control of Piper through cash and exchange tender offers for Piper common stock. Chris-Craft's takeover attempt failed, and Bangor Punta Corp. (Bangor or Bangor Punta), with the support of the Piper family, obtained control of Piper in September 1969. Chris-Craft brought suit under § 14 (e) of the Securities Exchange Act of 1934 and Rule 10b–6 alleging that Bangor Punta achieved control of the target corporation as a result of violations of the federal securities laws by the Piper family, Bangor Punta, and Bangor Punta's

underwriter, First Boston Corp., who together had sucessfully repelled Chris-Craft's takeover attempt.

The struggle for control of Piper began in December 1968. At that time, Chris-Craft began making cash purchases of Piper common stock. By January 22, 1969, Chris-Craft had acquired 203,700 shares, or approximately 13% of Piper's 1,644,790 outstanding shares. On the next day, following unsuccessful preliminary overtures to Piper by Chris-Craft's president, Herbert Siegel, Chris-Craft publicly announced a cash tender offer for up to 300,000 Piper shares[1] at $65 per share, which was approximately $12 above the then-current market price. Responding promptly to Chris-Craft's bid, Piper's management met on the same day with the company's investment banker, First Boston, and other advisers. On January 24, the Piper family decided to oppose Chris-Craft's tender offer. As part of its resistance to Chris-Craft's takeover campaign, Piper management sent several letters to the company's stockholders during January 25–27, arguing against acceptance of Chris-Craft's offer. On January 27, a letter to shareholders from W. T. Piper, Jr., president of the company, stated that the Piper Board "has carefully studied this offer and is convinced that it is inadequate and not in the best interests of Piper's shareholders."

In addition to communicating with shareholders, Piper entered into an agreement with Grumman Aircraft Corp. on January 29, whereby Grumman agreed to purchase 300,000 authorized but unissued Piper shares at $65 per share. The agreement increased the amount of stock necessary for Chris-Craft to secure control and thus rendered Piper less vulnerable to Chris-Craft's attack. A Piper press release and letter to shareholders announced the Grumman transaction but failed to state either that Grumman had a "put" or option to sell the shares back to Piper at cost, plus interest, or that

---

[1] The cash tender offer indicated that Chris-Craft reserved the right to purchase shares in excess of the 300,000 specified amount.

Piper was required to maintain the proceeds of the transaction in a separate fund free from liens.

Despite Piper's opposition, Chris-Craft succeeded in acquiring 304,606 shares by the time its cash tender offer expired on February 3. To obtain the additional 17% of Piper stock needed for control, Chris-Craft decided to make an exchange offer of Chris-Craft securities for Piper stock. Although Chris-Craft filed a registration statement and preliminary prospectus with the SEC in late February 1969, the exchange offer did not go into effect until May 15, 1969.

In the meantime, Chris-Craft made cash purchases of Piper stock on the open market until Mr. Siegel, the company's president, was expressly warned by SEC officials that such purchases, when made during the pendency of an exchange offer, violated SEC Rule 10b–6.[2] At Mr. Siegel's direction, Chris-Craft immediately complied with the SEC's directive and canceled all outstanding orders for purchases of Piper stock.

While Chris-Craft's exchange offer was in registration, Piper in March 1969 terminated the agreement with Grum-

---

[2] Rule 10b–6 provides in pertinent part:

"(a) It shall constitute a 'manipulative or deceptive device or contrivance' as used in section 10 (b) of the act for any person,

"(1) Who is an underwriter or prospective underwriter in a particular distribution of securities, or

"(2) Who is the issuer or other person on whose behalf such a distribution is being made, or

"(3) Who is a broker, dealer, or other person who has agreed to participate or is participating in such a distribution, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, either alone or with one or more other persons, to bid for or purchase for any account in which he has a beneficial interest, any security which is the subject of such distribution, or any security of the same class and series, or any right to purchase any such security, or to attempt to induce any person to purchase any such security or right, until after he has completed his participation in such distribution."

man and entered into negotiations with Bangor Punta. Bangor had initially been contacted by First Boston about the possibility of a Piper takeover in the wake of Chris-Craft's initial cash tender offer in January. With Grumman out of the picture, the Piper family agreed on May 8, 1969, to exchange their 31% stockholdings in Piper for Bangor Punta securities. Bangor also agreed to use its best efforts to achieve control of Piper by means of an exchange offer of Bangor securities for Piper common stock. A press release issued the same day announced the terms of the agreement, including a provision that the forthcoming exchange offer would involve Bangor securities to be valued, in the judgment of First Boston, "at not less than $80 per Piper share." [3]

While awaiting the effective date of its exchange offer, Bangor in mid-May 1969 purchased 120,200 shares of Piper stock in privately negotiated, off-exchange transactions from three large institutional investors. All three purchases were made after the SEC's issuance of a release on May 5 announcing proposed Rule 10b–13, a provision which, upon becoming effective in November 1969, would expressly prohibit a tender offeror from making purchases of the target company's stock during the pendency of an exchange offer. The SEC release stated that the proposed rule was "in effect, a codification of existing interpretations under Rule 10b–6," [4] the provision invoked by SEC officials against Mr. Siegel of Chris-Craft a month earlier. Bangor officials, although aware of the release at the time of the three off-exchange pur-

---

[3] Less than three weeks later, the SEC brought an action in Federal District Court charging that the Bangor press release violated "gun-jumping" provisions, 15 U. S. C. § 77e (c), and Rule 135, 17 CFR § 230.135 (1975), by stating a specific dollar valuation for unregistered securities. Without admitting any of the allegations, Bangor and Piper consented to a permanent injunction against similar releases before the effective date of Bangor's registration statement.

[4] SEC Release No. 8595, May 5, 1969, CCH Fed. Sec. L. Rep. ¶ 77,706, p. 83,617.

chases, made no attempt to secure an exemption for the transactions from the SEC, as provided by Rule 10b–6 (f). The SEC, however, took no action concerning these purchases as it had with respect to Chris-Craft's open-market transactions.

With these three block purchases, amounting to 7% of Piper stock, Bangor Punta in mid-May took the lead in the takeover contest. The contest then centered upon the competing exchange offers. Chris-Craft's first exchange offer, which began in mid-May 1969, failed to produce tenders of the specified minimum number of Piper shares (80,000). Meanwhile, Bangor Punta's exchange offer, which had been announced on May 8, became effective on July 18. The registration materials which Bangor filed with the SEC in connection with the exchange offer included financial statements, reviewed by First Boston, representing that one of Bangor's subsidiaries, the Bangor & Aroostock Railroad (BAR), had a value of $18.4 million. This valuation was based upon a 1965 appraisal by investment bankers after a proposed sale of the BAR failed to materialize. The financial statements did not indicate that Bangor was considering the sale of the BAR or that an offer to purchase the railroad for $5 million had been received.[5]

In the final phase of the see-saw of competing offers, Chris-Craft modified the terms of its previously unsuccessful exchange offer to make it more attractive. The revised offer succeeded in attracting 112,089 additional Piper shares, while Bangor's exchange offer, which terminated on July 29, resulted in the tendering of 110,802 shares. By August 4, 1969, at the conclusion of both offers, Bangor Punta owned a total of 44.5%, while Chris-Craft owned 40.6% of Piper stock. The remainder of Piper stock, 14.9%, remained in the hands of the public.

---

[5] Shortly after the contest for control was completed, Bangor entered into an agreement to sell the BAR for $5 million, thereby resulting in a $13.8 million book loss.

After completion of their respective exchange offers, both companies renewed market purchases of Piper stock,[6] but Chris-Craft, after purchasing 29,200 shares for cash in mid-August, withdrew from competition.[7]  Bangor Punta continued making cash purchases until September 5, by which time it had acquired a majority interest in Piper.  The final tally in the nine-month takeover battle showed that Bangor Punta held over 50% and Chris-Craft held 42% of Piper stock.

## II

Before either side had achieved control, the contest moved from the marketplace to the courts.  Then began more than seven years of complex litigation growing out of the contest for control of Piper Aircraft.

## A

### *Chris-Craft's Initial Suit*
### *May 22, 1969*

On May 22, 1969, Chris-Craft filed suit seeking both damages and injunctive relief in the United States District Court for the Southern District of New York.  Chris-Craft alleged that Bangor's block purchases of 120,200 Piper shares in mid-May violated Rule 10b–6 and that Bangor's May 8 press release, announcing an $80 valuation of Bangor securities to be offered in the forthcoming exchange offer, violated SEC "gun-jumping" provisions, 15 U. S. C. § 77e (c), and

---

[6] Since the respective distributions of securities pursuant to the exchange offers had been completed at this point, the legality of these market purchases was unchallenged.

[7] The reason for Chris-Craft's withdrawal from the contest is a matter in dispute.  According to one view, espoused by Judge Mansfield at one stage in the ensuing litigation, Chris-Craft had " 'shot its bolt' in the financial sense by early February 1969 . . . . It was in no position to purchase for cash any appreciable amount of Piper shares over and above the 304,606 tendered in response to its initial cash offer."  480 F. 2d 341, 402 (CA2 1973).

SEC Rule 135, 17 CFR § 230.135 (1976). Chris-Craft sought to enjoin Bangor from voting the Piper shares purchased in violation of Rule 10b–6 and from accepting any shares tendered by Piper stockholders pursuant to the exchange offer.

## B

### *District Court Decision on Preliminary Injunction*
### *August 19, 1969*

On July 22, 1969, Chris-Craft moved for a preliminary injunction against Bangor. In an opinion filed August 19, 1969, United States District Judge Charles Tenney denied relief. Judge Tenney concluded, first, that the May 8 press release had not violated the gun-jumping provisions, and, second, that Bangor's block purchases of Piper stock were not inconsistent with Rule 10b–6.

> "Bangor Punta's cash purchases . . . , effected *neither on the Exchange nor from or through a broker or dealer,* were obviously not designed to place market pressures on the distribution price of Piper, so as to create an artificially high price for this security." 303 F. Supp. 191, 198. (Emphasis supplied.) [8]

Judge Tenney, accordingly, concluded that neither irreparable injury nor likelihood of probable success on the merits had been established, particularly since the contest for control was still open.

> "[B]oth the Chris-Craft and Bangor Punta exchange offers have expired. Neither party has gained control of Piper, and both are still in a position to do so." *Id.,* at 199.

---

[8] Chris-Craft's earlier purchases, which were challenged by the SEC on the basis of Rule 10b–6, were open-market purchases. Mr. Siegel promptly stopped the purchases at the SEC's behest. *Supra,* at 6.

## C

*Court of Appeals' Decision on Preliminary Injunction*
*April 28, 1970*

On appeal, the Court of Appeals for the Second Circuit, sitting en banc, affirmed Judge Tenney's denial of injunctive relief. 426 F. 2d 569 (1970). In an opinion by Judge Waterman, the court held that Bangor had properly been allowed to continue soliciting Piper stock.

> "Chris-Craft was free [at the time of the District Court's decision] to compete equally with Bangor Punta for the remaining Piper shares, and it did so. We do not understand Chris-Craft to allege that prior misdeeds of Bangor Punta so determined the course of the competition . . . that Chris-Craft was placed at any real disadvantage." *Id.,* at 573.

The court concluded, however, that Bangor had violated SEC "gun-jumping" provisions and Rule 10b–6, unless the three block purchases fell within an established exemption to the Rule.[9]

Chief Judge Lumbard in dissent agreed that injunctive relief was unwarranted, but also accepted the District Court's determination that Bangor had not violated the securities laws.[10] *Id.,* at 579.

---

[9] Rule 10b–6 is set out in part at n. 2, *supra.* The Rule, among other things, prohibits an issuer or underwriter from purchasing any security which is the subject of a distribution. Eleven separate exemptions are created, however, including "unsolicited privately negotiated purchases [of stock] . . . effected neither on a securities exchange nor from or through a broker or dealer . . . ." 17 CFR § 240.10b–6 (a) (3) (ii) (1975).

[10] Two other judges wrote separately. Judge Moore expressed doubts as to the majority's legal conclusions concerning Bangor's alleged violations. He stated that he would not pass on any issue other than the propriety of the denial of injunctive relief. Judge Anderson, while concurring, expressed separate views concerning the materiality of the $80 valuation estimate in the May 8 press release.

The Court of Appeals remanded the case for further proceedings, so that Bangor, among other things, could attempt to establish that its block purchases fell within an exemption to Rule 10b–6.

## D

### District Court Decision on SEC Injunction
### August 25, 1971

While Chris-Craft's private suit was pending, the SEC sought an injunction against Bangor on account of the BAR omission in Bangor's registration statement. The SEC sought both an offer of rescission to Piper shareholders who accepted Bangor's exchange offer and an injunction against Bangor from violating the Securities Act of 1933 and the 1934 Act.

In an opinion by Judge Pollack, the District Court concluded that Bangor's registration statement was unintentionally misleading by virtue of the failure to disclose the fact that an offer had been received for the sale of the BAR. Accordingly, the court required Bangor to offer rescission to tendering Piper shareholders; however, the District Court refused to grant an injunction against future violations of the securities laws on the ground that the SEC had failed to establish that Bangor and its officials had a "propensity or natural inclination to violate the securities law." *SEC* v. *Bangor Punta Corp.*, 331 F. Supp. 1154, 1163 (1971).

## E

### District Court Decision on Liability
### December 10, 1971

On remand from the Court of Appeals, Chris-Craft's private action also came before Judge Pollack. Although its second amended complaint, which added a claim based on the BAR omission, sought both damages and injunctive relief, Chris-Craft at a pretrial hearing expressly abandoned its

prayer for equitable relief; the case was thereafter treated solely as an action for damages. 337 F. Supp. 1128, 1136 n. 8.

Following trial before the District Court without a jury, Judge Pollack in December 1971 dismissed Chris-Craft's complaint against all defendants. In an exhaustive opinion, he concluded that Chris-Craft had standing to seek damages for Bangor's Rule 10b–6 violations, 337 F. Supp., at 1133, but found it unnecessary to decide whether § 14 (e) could be invoked by one competitor for corporate control against another. 337 F. Supp., at 1134.[11]

On the merits, the District Court held that the Piper communications characterizing Chris-Craft's cash tender offer as "inadequate" were not misleading. The court concluded that the "more rational" view was that the statements referred to factors other than price, such as Piper's views as to the quality of Chris-Craft's management. *Id.*, at 1135. The court also rejected Chris-Craft's contention that it had been injured by the omission in the Grumman press release concerning the "put" or option provision in the agreement. The District Court concluded that Piper's complete description of the provision in a listing application with the New York Stock Exchange, coupled with Chris-Craft's major acquisitions of Piper stock after learning of the "put," undermined Chris-Craft's claim that it was misled or otherwise injured by the announcement of the Grumman transaction. *Ibid.*

With respect to the May 8 press release, which the Court of Appeals had held violative of the "gun-jumping" rules, the District Court held that the release, although technically a violation, was not false or misleading. Moreover, Chris-Craft had failed to show that it was injured or disadvantaged by the release in its efforts to acquire Piper stock. *Id.*, at 1137.

---

[11] Judge Pollack avoided the § 14 (e) issue by ruling against Chris-Craft on the merits of its antifraud claims under Rule 10b–5, with respect to which Chris-Craft's standing was assumed. 337 F. Supp., at 1134.

As to the claim of a misleading valuation of the BAR, Judge Pollack held that Chris-Craft failed to show either scienter or causation as required in a damages action under the 1934 Act's antifraud provisions.   Scienter was not established, the court concluded, since the BAR omission was "mere negligent omission or misstatement of fact."   *Id.,* at 1140.   As to causation, the District Court specifically distinguished this Court's decision in *Mills* v. *Electric Auto-Lite Co.,* 396 U. S. 375 (1970), which established a presumption of causation in a § 14 (a) suit by minority shareholders challenging misleading proxy materials.   The omission in the proxy statement in that case, the District Court reasoned, directly affected the shareholders on whose behalf the suit was brought:

> "It was in that particular context that the Supreme Court deemed sufficient a set of facts under which shareholders *could* be misled.   This does not aid Chris-Craft as it is seeking to recover because of the effect which a misstatement allegedly had on third parties." 337 F. Supp., at 1139.   (Emphasis in original.)   (Footnote omitted.)

Given the differences between the instant case and *Mills,* the District Court went on to hold that proof of actual causation was required:

> "There is no proof that a single exchanging Piper shareholder would have refrained from the exchange *and* taken an offer for his shares from Chris-Craft instead of that from Bangor Punta.   In a damage suit, as distinct from one for equitable relief, such proof is essential to sustain a 10b–5 claim."   *Ibid.*   (Emphasis in original.)

On Chris-Craft's Rule 10b–6 claim, Judge Pollack held that, although the block purchases did not fall within any exemption to the Rule, Chris-Craft had no right to recovery:

> "Even granting that the block purchases resulted arith-

metically in Bangor Punta's achievement of control, there is no basis for concluding that, absent Bangor Punta's acquisition of these blocks, Chris-Craft would have achieved its goal of control." *Id.,* at 1142.

Based on its findings with respect to Piper and Bangor Punta, the District Court also held in favor of First Boston; the court specifically exonerated the firm of having "committed, or engaged in any course of conduct which operated as a fraud or deceit upon Chris-Craft or the public shareholders of Piper." *Id.,* at 1145.

## F

### *Court of Appeals Decision on Liability*
### *March 16, 1973*

Chris-Craft appealed, and the SEC sought review of the District Court's denial of injunctive relief against Bangor Punta. In the Court of Appeals, each member of the panel wrote separately. All three members of the panel agreed that Chris-Craft had standing to sue for damages under § 14 (e) and that a claim for damages had been established. However, Judges Gurfein and Mansfield, over Judge Timbers' dissent, sustained the District Court's denial of an injunction against Bangor.

### *Court of Appeals Majority Opinion*

The Court of Appeals directly answered the question concerning Chris-Craft's standing under § 14 (e), which the District Court had not decided.[12] The Court of Appeals based its holding "on the statute itself [§ 14 (e)] and such decisional law as there is that has touched on the question." 480 F. 2d 341, 358. The opinion noted that the Second

_____

[12] Judge Pollack "assumed" that Chris-Craft had standing under Rule 10b-5, but the Court of Appeals expressly avoided passing on that issue, since it determined that Chris-Craft had standing under § 14 (e).

Circuit had on four occasions [13] addressed the issue whether a private cause of action might be implied under § 14 (e). Although acknowledging that no case represented a square holding in this respect, the court interpreted the cases to intimate "that such an implied right of action would be reasonable." 480 F. 2d, at 360. The court then noted that Chris-Craft could likely state a common-law tort claim in state court for "interference with a 'prospective advantage.'" *Ibid.*

"We will not infer from the silence of the statute that Congress intended to deny a federal remedy and to extinguish a liability which, under established principles of tort law, normally attends the doing of a proscribed act." *Id.*, at 360–361.

With respect to the legislative history of § 14 (e), the Court of Appeals expressly acknowledged that the focus of congressional concern was the protection of public shareholders. Given this purpose, the court concluded:

"We can conceive of no more effective means of furthering the general objective of § 14 (e) than to grant a victim of violations of the statute standing to sue for damages. . . . Particularly in light of the enforcement rationale of [*J. I. Case Co.* v.] *Borak,* [377 U. S. 426 (1964),] we believe it is both necessary and appropriate that [Chris-Craft] should be granted standing to sue for damages." 480 F. 2d, at 361.

---

[13] *Electronic Specialty Co.* v. *International Controls Corp.,* 409 F. 2d 937 (1969) (suit by a target corporation against a tender offeror for injunctive relief); *Butler Aviation Int'l, Inc.* v. *Comprehensive Designers, Inc.,* 425 F. 2d 842 (1970) (suit for a preliminary injunction by a target corporation against a tender offeror); *Crane Co.* v. *Westinghouse Air Brake Co.,* 419 F. 2d 787 (1969) (action for an injunction under § 10 (b) by a tender offeror against the target corporation); *Iroquois Industries, Inc.* v. *Syracuse China Corp.,* 417 F. 2d 963 (1969), cert. denied, 399 U. S. 909 (1970) (action under § 10 (b) by a tender offeror against the target corporation).

The court next reviewed the alleged § 14 (e) violations for which Chris-Craft sought damages. In contrast to the District Court's conclusions, the Court of Appeals held that Piper's description of the Chris-Craft offer as "inadequate" and the failure to disclose the "put" provision in the Grumman agreement constituted actionable violations of § 14 (e). 480 F. 2d, at 364–365. As to Bangor Punta, the Court of Appeals agreed with Judge Pollack's determination that Chris-Craft had not been injured by the "gun-jumping" press release of May 8; on the other hand, the court held that the BAR omission in Bangor's registration statement was actionable. The Court of Appeals expressly rejected Judge Pollack's conclusion that the registration statement was "unintentionally in error." On the contrary, the Court of Appeals held that Bangor Punta's officers "showed reckless disregard" in failing to disclose the BAR negotiations, although the court conceded that the officers were not shown to have had an "intent to defraud." *Id.*, at 369. First Boston was likewise held culpable because its certification of the registration statement "amounted to an almost complete abdication of its responsibility [as an underwriter] . . . ." *Id.*, at 373.

The Court of Appeals also disagreed with the District Court's analysis of causation. Although agreeing that Chris-Craft failed to show that it would have won the takeover battle,[14] the court relied upon *Mills* v. *Electric Auto-Lite Co.*, 396 U. S. 375 (1970), as establishing a presumption of reliance

---

[14] The District Court had looked to whether Chris-Craft would have succeeded in securing control even if Bangor had abided by the securities laws. In its analysis of causation, the Court of Appeals expressly agreed that Chris-Craft "failed to show with reasonable certainty that it would have obtained a controlling position in Piper had it not been for the violations . . ." of Bangor and First Boston. 480 F. 2d, at 373. Nonetheless, causation was found. See generally Note, Chris-Craft: The Uncertain Evolution of Section 14 (e), 76 Colum. L. Rev. 634, 650–658 (1976).

and causation applicable to Chris-Craft. Under *Mills,* so the court held, "we must presume that [Bangor's] offer was not so appealing, considering the BAR loss, as to have attracted any takers." 480 F. 2d, at 375.

> "Since [Bangor] eventually acquired only about 51% of the outstanding Piper shares, it is clear that the 7% acquired through its exchange offer was critical to its success. Reliance and causation have been shown." *Ibid.*

In addition to the § 14 (e) claim, the Court of Appeals held that Chris-Craft could recover damages for Bangor's Rule 10b–6 violations; the three block purchases had a "presumptively . . . stimulating effect . . . which misled the public." 480 F. 2d, at 378. Since those purchases amounted to 7% of Piper stock, "[e]ven arithmetically, it is apparent that the block purchases [by Bangor Punta] . . . were essential to achieve control." *Id.,* at 379.

The Court of Appeals then remanded with directions to the District Court to award damages in the amount of "the reduction in the appraisal value of [Chris-Craft's] Piper holdings attributable to [Bangor Punta's] taking a majority position and reducing [Chris-Craft] to a minority position. . . ." *Id.,* at 380. Damages were to be awarded against all defendants jointly and severally. In addition, without discussing Chris-Craft's abandonment of its claim for equitable relief, the court instructed the District Court to enjoin Bangor for a period of at least five years from voting the Piper shares acquired through the exchange offer and in violation of Rule 10b–6. *Ibid.*

Finally, Judge Timbers, writing in dissent on this issue, disagreed with the conclusion of Judges Mansfield and Gurfein that the SEC request for an injunction against future violations by Bangor Punta had properly been refused. In Judge Timbers' view, the District Court employed an im-

proper legal standard in denying the SEC injunctive relief against Bangor.

*Judge Gurfein's Concurring Opinion*

Judge Gurfein concurred "generally" in Judge Timbers' opinion for the court. On the issue of standing, Judge Gurfein agreed with the District Court's approach in considering the matter as one of "causation before considering the question of standing." 480 F. 2d, at 393. Under Judge Gurfein's approach, Chris-Craft had standing because Bangor's acquisitions of Piper shares were necessary for control. As to scienter, Judge Gurfein was of the view that "mere negligence" would not suffice but that " 'recklessness that is equivalent to wilful fraud' is required . . . ." *Ibid.* (Citation omitted.)

Judge Gurfein disagreed, however, with Judge Timbers' analysis of the alleged Rule 10b–6 violations. He refused to indulge the presumption of "stimulating effect" embraced by Judge Timbers and concluded rather that because "the [illegal] block purchases were necessary for control causation was established. . . ." 480 F. 2d, at 393.

With respect to the SEC action against Bangor Punta, Judge Gurfein, writing for himself and Judge Mansfield, upheld the District Court's refusal to grant a permanent injunction. Applying the "abuse of discretion" standard, Judge Gurfein concluded that "the matter is not so clear that we should substitute our judgment for the judgment of the experienced trial Judge below who sat as a chancellor in equity." *Ibid.*

*Judge Mansfield's Concurring and Dissenting Opinion*

Judge Mansfield concurred in the "results" reached by Judge Timbers, except with respect to the Piper family's liability. Judge Mansfield agreed that the Piper communications violated § 14 (e), but concluded that Chris-Craft had failed to prove damages resulting from those infractions.

Applying the principles of *Mills* v. *Electric Auto-Lite Co.,* *supra,* Judge Mansfield stated:

> "[Chris-Craft] must show that it suffered some resulting loss. This it has failed to do." 480 F. 2d, at 401.

On the other issues addressed by the majority opinion, Judge Mansfield concluded that Chris-Craft's standing under § 14 (e) rested solely on the policy of vigorous enforcement of the antifraud provisions. 480 F. 2d, at 396. As to scienter, Judge Mansfield concluded that intent to defraud had not been shown. He formulated instead the following test of scienter:

> "In short, the *scienter* requirement would be met if the corporate officer (1) knew the essential facts and failed to disclose them, or (2) failed or refused, after being put on notice of a possible material failure in disclosure, to apprise himself of the facts under circumstances where he could reasonably have ascertained and disclosed them without any extraordinary effort." *Id.,* at 398.

He concluded that the actions complained of satisfied this standard.

Like Judge Gurfein, Judge Mansfield declined to indulge the presumption that Bangor's Rule 10b–6 violations actually operated to make its exchange offer deceptively attractive; he concurred solely on the ground that where a party achieves control through violations of the securities laws, the party is liable as a matter of law to an injured competitor.[15]

## G

### District Court Opinion on Relief
### November 6, 1974

Pursuant to the remand, Judge Pollack took evidence on damages. Although concluding that the Court of Appeals'

---

[15] Following the Court of Appeals' decision, petitions for review were filed in this Court by First Boston, Bangor Punta, and the Piper defendants. Certiorari was denied. 414 U. S. 910 (1973).

mandate required the use of "hypothetical figures," he determined that Chris-Craft's damages were to be measured by comparing the value of its Piper holdings prior and subsequent to Bangor's achieving control. 384 F. Supp. 507, 512 (1974). Employing this method, he concluded on the basis of expert testimony that the fair market value of Piper stock as of the day Bangor achieved control was $48 per share. *Id.*, at 517. After ascertaining that the value of Chris-Craft's takeover opportunity amounted to 5% of the fair market value of the stock, or $2.40 per share, *id.*, at 523, the District Court awarded to Chris-Craft, based on its holdings of 697,495 shares, damages of $1,673,988. *Ibid.* The District Court also granted an award of prejudgment interest and entered an injunction, consistent with the mandate of the Court of Appeals, barring Bangor from voting the illegally acquired Piper shares for five years. *Id.*, at 526.

## H

### *Court of Appeals' Opinion on Relief*
### *April 11, 1975*

In the final phase of the litigation, the Court of Appeals reversed on the damages issue and calculated Chris-Craft's damages without further remand to the District Court. The Court of Appeals fixed damages as the difference between what Chris-Craft had actually paid for Piper shares and the price at which the large minority block could have been sold at the earliest point after Bangor Punta gained control. Application of this formula produced damages in the amount of $36.98 per Piper share held by Chris-Craft, or a total of $25,793,365. 516 F. 2d 172, 190 (1975). The court instructed the District Court to recompute prejudgment interest based on the revised damages award. *Id.*, at 191. This new computation increased Chris-Craft's prejudgment interest from $600,000 to approximately $10 million.

It is this judgment which is now under review.

## III

### *The Williams Act*

We turn first to an examination of the Williams Act, which was adopted in 1968 in response to the growing use of cash tender offers as a means for achieving corporate takeovers.[16] Prior to the 1960's, corporate takeover attempts had typically involved either proxy solicitations, regulated under § 14 of the Securities Exchange Act, 15 U. S. C. § 78n, or exchange offers of securities, subject to the registration requirements of the 1933 Act. § 77e. The proliferation of cash tender offers, in which publicized requests are made and intensive campaigns conducted for tenders of shares of stock at a fixed price, removed a substantial number of corporate control contests from the reach of existing disclosure requirements of the federal securities laws. See generally S. Rep. No. 550, 90th Cong., 1st Sess., 2–4 (1967) (hereinafter Senate Report); H. R. Rep. No. 1711, 90th Cong., 2d Sess., 2–4 (1968) (hereinafter House Report).

To remedy this gap in federal regulation, Senator Harrison Williams introduced a bill in October 1965 to subject tender offerors to advance disclosure requirements. The original proposal, S. 2732, evolved over the next two years in response to positions expressed by the SEC and other interested parties from private industry and the New York Stock Exchange. 113 Cong. Rec. 854 (1967) (remarks of Sen. Williams). As subsequently enacted, the legislation requires takeover bidders to file a statement with the Commission indicating, among other things, the "background and identity" of the offeror, the source and amount of funds or other consideration to be used in making the purchases, the

---

[16] The proliferation of cash tender offers as devices for securing corporate control is analyzed in detail in Hayes & Taussig, Tactics of Cash Takeover Bids, 45 Harv. Bus. Rev. 135 (Mar.–Apr. 1967). See also E. Aranow & H. Einhorn, Tender Offers for Corporate Control 2–10 (1973).

.extent of the offeror's holdings in the target corporation, and the offeror's plans with respect to the target corporation's business or corporate structure. 15 U. S. C. § 78m (d)(1).

In addition to disclosure requirements, which protect all target shareholders, the Williams Act provides other benefits for target shareholders who elect to tender their stock. First, stockholders who accept the tender offer are given the right to withdraw their shares during the first seven days of the tender offer and at any time after 60 days from the commencement of the offer. § 78n (d)(5). Second, where the tender offer is for less than all outstanding shares and more than the requested number of shares are tendered, the Act requires that the tendered securities be taken up pro rata by the offeror during the first. 10 days of the offer. § 78n (d)(6).[17] This provision, according to Senator Williams, was specifically designed to reduce pressures on target shareholders to deposit their shares hastily when the takeover bidder makes its tender offer on a first-come, first-served basis. 113 Cong. Rec. 856 (1967). Finally, the Act provides that if, during the course of the offer, the amount paid for the target shares is increased, all tendering shareholders are to receive the additional consideration, even if they tendered their stock before the price increase was announced. 15 U. S. C. § 78n (d)(7). See generally 1 A. Bromberg, Securities Law: Fraud § 6.3 (551), p. 120.2 (1975).

---

[17] The SEC had proposed that the pro rata requirement be applied throughout the duration of the offer. Hearings on S. 510 before the Subcommittee on Securities of the Senate Committee on Banking and Currency, 90th Cong., 1st Sess., 200 (1967) (hereinafter Senate Hearings). See generally Cohen, A Note on Takeover Bids and Corporate Purchases of Stock, 22 Bus. Law. 149, 153–154 (1966). See also 6 L. Loss, Securities Regulation 3662 (Supp. 1969). This open-ended proposal came under substantial criticism in the legislative hearings, and Congress finally enacted a 10-day limitation on the pro rata acceptance requirement. The 10-day period was identical to the practice followed by the New York Stock Exchange. Senate Hearings 76.

Besides requiring disclosure and providing specific benefits for tendering shareholders, the Williams Act also contains a broad antifraud prohibition, which is the basis of Chris-Craft's claim. Section 14 (e) of the Securities Exchange Act, as added by § 3 of the Williams Act, 82 Stat. 457, 15 U. S. C. § 78n (e), provides:

"It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation."

This provision was expressly directed at the conduct of a broad range of persons, including those engaged in making or opposing tender offers or otherwise seeking to influence the decision of investors or the outcome of the tender offer. Senate Report 11.

The threshold issue in these cases is whether tender offerors such as Chris-Craft, whose activities are regulated by the Williams Act, have a cause of action for damages against other regulated parties under the statute on a claim that antifraud violations by other parties have frustrated the bidder's efforts to obtain control of the target corporation. Without reading such a cause of action into the Act, none of the other issues need be reached.

IV

Our analysis begins, of course, with the statute itself. Section 14 (e), like § 10 (b), makes no provision whatever for a private cause of action, such as those explicitly provided in other sections of the 1933 and 1934 Acts. *E. g.,* §§ 11, 12, 15 of the 1933 Act, 15 U. S. C. §§ 77k, 77*l*, 77*o*; §§ 9, 16, 18, 20

of the 1934 Act, 15 U. S. C. §§ 78i, 78p, 78r, 78t. This Court has nonetheless held that in some circumstances a private cause of action can be implied with respect to the 1934 Act's antifraud provisions, even though the relevant provisions are silent as to remedies. *J. I. Case Co.* v. *Borak,* 377 U. S. 426 (1964) (§ 14(a)); *Superintendent of Ins.* v. *Bankers Life & Cas. Co.,* 404 U. S. 6, 13 n. 9 (1971) (§ 10 (b)).

The reasoning of these holdings is that, where congressional purposes are likely to be undermined absent private enforcement, private remedies may be implied in favor of the particular class intended to be protected by the statute. For example, in *J. I. Case Co.* v. *Borak, supra,* recognizing an implied right of action in favor of a shareholder complaining of a misleading proxy solicitation, the Court concluded as to such a shareholder's right:

> "While [§ 14 (a)] makes no specific reference to a private right of action, among its chief purposes is *'the protection of investors,'* which certainly implies the availability of judicial relief *where necessary to achieve that result."* 377 U. S., at 432. (Emphasis supplied.)

Indeed, the Court in *Borak* carefully noted that because of practical limitations upon the SEC's enforcement capabilities, "[p]rivate enforcement . . . provides *a necessary supplement to Commission action." Ibid.* (Emphasis added.) Similarly, the Court's opinion in *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 730 (1975), in reaffirming the availability of a private right of action under § 10 (b), specifically alluded to the language in *Borak* concerning the *necessity* for supplemental private remedies without which congressional protection of shareholders would be defeated. See also *Rondeau* v. *Mosinee Paper Corp.,* 422 U. S. 49, 62 (1975).

Against this background we must consider whether § 14 (e), which is entirely silent as to private remedies, permits this Court to read into the statute a damages remedy for unsuccessful tender offerors. To resolve that question we turn to the

legislative history to discern the congressional purpose under-lying the specific statutory prohibition in § 14 (e). Once we identify the legislative purpose, we must then determine whether the creation by judicial interpretation of the implied cause of action asserted by Chris-Craft is necessary to effectuate Congress' goals.

### A

Reliance on legislative history in divining the intent of Congress is, as has often been observed, a step to be taken cautiously. *Department of Air Force* v. *Rose,* 425 U. S. 352, 388–389 (1976) (BLACKMUN, J., dissenting); *United States* v. *Public Utilities Comm'n,* 345 U. S. 295, 319 (1953) (Jackson, J., concurring); *Scripps-Howard Radio* v. *FCC,* 316 U. S. 4, 11 (1942). In this case both sides press legislative history on the Court not so much to explain the meaning of the language of a statute as to explain the absence of any express provision for a private cause of action for damages. As Mr. Justice Frankfurter reminded us: "We must be wary against interpolating our notions of policy in the interstices of legis-lative provisions." *Ibid.* With that caveat, we turn to the legislative history of the Williams Act.

In introducing the legislation on the Senate floor, the sponsor, Senator Williams, stated:

> "This legislation will close a significant gap in *investor protection* under the Federal securities laws by requiring the disclosure of pertinent information *to stockholders* when persons seek to obtain control of a corporation by a cash tender offer or through open market or privately negotiated purchases of securities." 113 Cong. Rec. 854 (1967). (Emphasis supplied.)

The same theme of investor protection was emphasized eight months later by Senator Williams on the day the measure was passed by the Senate:

> "[The federal securities laws] provide protection for millions of American investors by requiring full disclosure

of information in connection with the public offering and trading of securities. These laws have worked well in providing the public with adequate information on which to base intelligent investment decisions.

. . . . .

"There are, however, some areas still remaining where full disclosure is *necessary for investor protection* but not required by present law. One such area is the purchase by direct acquisition or by tender offers of substantial blocks of the securities of publicly held companies.

"S. 510 . . . provides for investor protection in these areas." *Id.*, at 24664. (Emphasis supplied.)

Indeed, the bill as finally enacted by Congress was styled as a disclosure provision: "A bill to provide for full disclosure of corporate equity ownership of securities under the Securities Exchange Act of 1934." See generally 1 A. Bromberg, *supra,* § 6.3 (121), at 116.2.

Confirming the view that the legislation was designed to fill "a rather large gap in the securities statutes," Manuel Cohen, then Chairman of the SEC, testified before the Senate Subcommittee on Securities:

"[T]he general approach . . . of this bill is to provide the investor, the person who is required to make a decision, an opportunity to examine and to assess the relevant facts . . . ." Senate Hearings 15.

In response to the suggestion that the legislation would tend to aid entrenched management in warding off potentially beneficial takeover bids; Chairman Cohen testified:

"But *the principal point is that we are not concerned with assisting or hurting either side.* We are concerned with *the investor* who today is just a pawn in a form of industrial warfare. . . . The investor is lost somewhere

in the shuffle. *This is our concern and our only concern." Id.*, at 178. (Emphasis supplied.)

The legislative history thus shows that Congress was intent upon regulating takeover bidders, theretofore operating covertly, in order to protect the shareholders of target companies. That tender offerors were not the intended beneficiaries of the bill was graphically illustrated by the statements of Senator Kuchel, cosponsor of the legislation, in support of requiring takeover bidders, whom he described as "corporate raiders" and "takeover pirates," to disclose their activities.

"Today there are those individuals in our financial community who seek to reduce our proudest businesses into nothing but corporate shells. They seize control of the corporation with unknown sources, sell or trade away the best assets, and later split up the remains among themselves. The tragedy of such collusion is that the corporation can be financially raped without management *or shareholders* having any knowledge of the acquisitions. . . . The corporate raider may thus act under a cloak of secrecy while obtaining the shares needed to put him on the road to a successful capture of the company." 113 Cong. Rec. 857–858 (1967). (Emphasis supplied.)

At different stages of the legislative debate, Senator Kuchel called the Senate's attention to specific takeover attempts directed against two companies. During the floor debate on the day S. 510 was passed, Senator Kuchel described one takeover contest:

"If this attempt had succeeded, [the company] would have found itself under the control of a combination including significant foreign interests, without prior notice to the company, without an opportunity for examination into the circumstances surrounding the tender

offer, and without any regard *for the rights of its stock-holders.*  *Id.,* at 24665.  (Emphasis supplied.)

Moreover, the Senate Subcommittee heard the testimony of Professor Hayes, speaking on behalf of himself and his co-author of a comprehensive study on takeover attempts,[18] who stated:

> "The two major protagonists—the bidder and the defending management—*do not need any additional protection,* in our opinion.  They have the resources and the arsenal of moves and countermoves which can adequately protect their interests.  Rather, *the investor*—who is the subject of these entreaties of both major protagonists—*is the one who needs a more effective champion . . . ."*
> Senate Hearings 57.  (Emphasis supplied.)

In the face of this legislative history, the Court of Appeals understandably did not rely upon the legislative materials to support an implied cause of action for damages in favor of Chris-Craft.  In this Court, however, Chris-Craft and the SEC contend that Congress clearly intended to protect tender offerors as part of a "pervasive scheme of federal regulation of tender offers."  In support of their reading of the legislative history, they emphasize, first, that in enacting the legislation Congress was intent upon establishing a policy of evenhandedness in takeover regulation.  Congress was particularly anxious, Chris-Craft argues, " 'to avoid tipping the balance of regulation . . . .' "

Congress was indeed committed to a policy of neutrality in contests for control, but its policy of evenhandedness does not go either to the purpose of the legislation or to whether a private cause of action is implicit in the statute.  Neutrality is, rather, but one characteristic of legislation directed toward a different purpose—the protection of investors.  Indeed, the statements concerning the need for Congress to

---

[18] Hayes & Taussig, Tactics of Cash Takeover Bids, *supra,* n. 16.

maintain a neutral posture in takeover attempts are contained in the section of the Senate Report entitled, "Protection of Investors." Taken in their totality, these statements confirm that what Congress had in mind was the protection of shareholders, the "pawn[s] in a form of industrial warfare." The Senate Report expressed the purpose as "plac[ing] investors on an equal footing with the takeover bidder," Senate Report 4, without favoring either the tender offeror or existing management. This express policy of neutrality scarcely suggests an intent to confer highly important, new rights upon the class of participants whose activities prompted the legislation in the first instance.

Moreover, closer analysis shows that Congress' "equal footing" observations were in response to strong criticisms that the proposed legislation would unduly inhibit tender offers.[19] As originally introduced, the disclosure proposals embodied in S. 2731 were avowedly pro-management in the *target* company's efforts to defeat takeover bids. See generally Note, The Williams Amendments: An Evaluation of the Early Returns, 23 Vand. L. Rev. 700 (1970). Subsequent committee hearings, however, indicated, first, that takeover bids could often serve a useful function, and, second, that entrenched management, equipped with considerable weapons in battles for control, tended to be successful in fending off possibly beneficial takeover attempts. Several witnesses specifically called the efficacy of the proposed legislation into question, since in their view the "scales are pretty unbalanced at the moment, and unbalanced very much in favor of management." Senate Hearings 117.

The sponsors of this legislation were plainly sensitive to the suggestion that the measure would favor one side or the other in control contests; however, they made it clear that

---

[19] Requiring the tender offeror to reveal detailed information at the outset of the quest for control would, under the critics' analysis, fortify management's position in rebuffing contestants' efforts.

the legislation was designed solely to get needed information to the investor, the constant focal point of the committee hearings. Senator Williams articulated this singleness of purpose, even while advocating neutrality:

> "We have taken extreme care to avoid tipping the scales either in favor of management or in favor of the person making the takeover bids. *S. 510 is designed solely to require full and fair disclosure for the benefit of investors.*" 113 Cong. Rec. 24664 (1967). (Emphasis supplied.)

Accordingly, the congressional policy of "evenhandedness" is nonprobative of the quite disparate proposition that the Williams Act was intended to confer rights for money damages upon an injured takeover bidder.

Besides the policy of evenhandedness, Chris-Craft emphasizes that the matter of implied private causes of action was raised in written submissions to the Senate Subcommittee. Specifically, Chris-Craft points to the written statements of Professors Israels and Painter, who made reference to *J. I. Case Co. v. Borak,* 377 U. S. 426 (1964). Chris-Craft contends, therefore, that Congress was aware that private actions were implicit in § 14 (e).

But this conclusion places more weight on the passing reference to *Borak* than can reasonably be carried. Even accepting the value of written statements received without comment by the committee and without cross-examination,[20] the statements do not refer to implied private actions by

---

[20] Only last Term we indicated that similar materials in the legislative history of the 1934 Act were of limited value.

"Remarks of this kind made in the course of legislative debate or hearings other than by persons responsible for the preparation or the drafting of a bill are entitled to little weight." *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185, 204 n. 24 (1976).

See generally 2A C. Sands, Sutherland on Statutes and Statutory Construction § 48.06, p. 203 (4th ed. 1973).

*offeror-bidders.* For example, Professor Israels' statement on this subject reads:

> "[A] private litigant could seek similar relief before or after the significant fact *such as the acceptance of his tender of securities."* Senate Hearings 67. (Emphasis supplied.)

Similarly, Professor Painter in his written submission referred to "injured investors." *Id.,* at 140. Neither Israels nor Painter discussed or even alluded to remedies potentially available to takeover bidders.

More important, these statements referred to a case in which the remedy was afforded to shareholders—the *direct* and *intended* beneficiaries of the legislation. In *Borak,* the Court emphasized that § 14 (a), the proxy provision, was adopted expressly for "the protection of investors," 377 U. S., at 432, the very class of persons there seeking relief.[21] The

---

[21] The dissent emphasizes that *Borak* involved a derivative suit brought on behalf of the corporation, in addition to the shareholder's direct cause of action. Since corporations were not the primary beneficiaries of § 14 (a)—the proxy provision involved in *Borak*—the dissent concludes that *Borak* itself fails to meet the "especial class" requirement articulated by our subsequent decision in *Cort* v. *Ash. Post,* at 66–67. But this is a misreading of *Borak;* there, the Court observed that deceptive proxy solicitations violative of § 14 (a) injure the corporation in the following sense:

"The damage suffered results not from the deceit practiced on [the individual shareholder] alone but rather from the deceit practiced on the stockholders as a group." 377 U. S., at 432.

The *Borak* Court was thus focusing on all stockholders—the owners of the corporation—as the beneficiaries of § 14 (a). Stockholders as a class therefore plainly constituted the "especial class" for which the proxy provisions were enacted. This reading of *Borak* comports with the statement of the question presented in that case:

"We consider only the question of whether § 27 of the Act authorizes a federal cause of action for rescission or damages *to a corporate stockholder* with respect to a consummated merger. . . ." 377 U. S., at 428. (Emphasis supplied.)

Court found no difficulty in identifying the legislative objective and concluding that remedies should be available if necessary "to make effective the congressional purpose." *Id.*, at 433. *Borak* did not involve, and the statements in the legislative history relied upon by Chris-Craft do not implicate, the interests of parties such as offeror-bidders who are outside the scope of the concerns articulated in the evolution of this legislation.[22]

Chris-Craft and the SEC also rely upon statements in the legislative history which, they suggest, demonstrate that Congress in adopting the Williams Act was concerned with parties other than shareholders. First, they place particular emphasis upon a statement by Chairman Cohen in his Senate testimony that "shareholders are not the only persons concerned." From this statement, they argue that tender offerors were likewise within the sphere of congressional concern. In that colloquy, however, Chairman Cohen was plainly referring to persons in need of disclosure:

> "As soon as there is a takeover bid, everybody in the market gets excited. There are people who consider themselves professional or amateur arbitragers, and they begin to play the games that possibility permits." Senate Hearings 178.

Thus, Chairman Cohen was referring to other actors in the marketplace, including arbitragers, who would benefit from disclosure. He was not referring to the needs of those required by the proposed legislation to make disclosure, the tender offerors themselves.

---

[22] In this connection, Chris-Craft emphasizes Congress' intent to treat tender offers in the same way as proxy solicitations, since both are devices for seeking corporate control. This argument, however, does not support the proposition that Chris-Craft should have a cause of action for damages, since this Court had not then held, nor has it since, that defeated insurgents in a proxy fight, suing in a capacity other than that of a shareholder, have a cause of action for damages. There is no occasion to resolve that question in this case.

Finally, Chris-Craft emphasizes what it perceives as the Commission's express concern with the plight of takeover bidders faced with "unfair tactics by entrenched management." The SEC Chairman did indeed speak in the Subcommittee Hearings of the need to "regulate improper practices by management and others opposing a tender offer . . . ." Senate Hearings 184. But in so doing, he was not pleading the cause of takeover bidders; on the contrary, he testified that imposing disclosure duties upon management would "make it much easier for *stockholders* to evaluate the offer on its merits." *Ibid.* (Emphasis supplied.)

In short, by extending the statute's coverage to solicitations in opposition to tender offers, Congress was seeking to broaden the scope of protection afforded to shareholders confronted with competing claims. Senator Williams, for example, was fully aware that in a contest for control, full disclosure by all contestants was needed to protect shareholders:

"In the rather common situation where existing management or third parties contest a tender offer, shareholders may be exposed to a bewildering variety of conflicting appeals and arguments designed to persuade them either to accept or to reject the tender offer. The experience of the SEC with proxy fights offers ample evidence that this type of situation can best be controlled, and *shareholders most adequately informed,* if both sides to the argument are subject to the full and fair disclosure rules of the Federal securities laws." 113 Cong. Rec. 855–856 (1967). (Emphasis supplied.)

Furthermore, in the very passages on which Chris-Craft relies as evidencing SEC concern for tender offerors, Chairman Cohen criticized any analysis which focused upon the legislation's impact on management or the takeover bidder:

"Moreover, this type of analysis lays almost exclusive stress on the respective interests of the offeror and the

existing management, *rather than upon the protection of the stockholders* . . . who are left to be treated as pawns in an elaborate game between the offerors and the management or perhaps other competing interests." Senate Hearings 184. (Emphasis supplied.)

The legislative history thus shows that the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer. As we stated in *Rondeau* v. *Mosinee Paper Corp.*, 422 U. S., at 58: "The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information . . . ." We find no hint in the legislative history, on which respondent so heavily relies, that Congress contemplated a private cause of action for damages by one of several contending offerors against a successful bidder or by a losing contender against the target corporation.

The dissent suggests, however, that Chris-Craft is suing under § 14 (e) for injuries sustained in its status as a Piper shareholder, as well as in its capacity as a defeated tender offeror. *Post,* at 56–59. In contrast to that suggestion, Chris-Craft's position in this Court on the issue of standing is based on the narrow ground that the Williams Act was designed to protect not only target company shareholders, but rival contestants for control as well. Brief for Respondent 36–40, 43, 46–48, 50–54. It is clear, therefore, that Chris-Craft has not asserted standing under § 14 (e) as a Piper shareholder. The reason is not hard to divine. As a tender offeror actively engaged in competing for Piper stock, Chris-Craft was not in the posture of a target shareholder confronted with the decision of whether to tender or retain its stock. Consequently, Chris-Craft could scarcely have alleged a need for the disclosures mandated by the Williams Act. In short, the fact that Chris-Craft necessarily acquired Piper stock as a means of taking over Piper adds nothing to its § 14 (e) standing

arguments.[23]   This probably explains why the Court of Appeals at no time intimated that it rested Chris-Craft's standing on its status as a Piper stockholder.   Its opinion in this respect could hardly be clearer:

> "This is a case of first impression with respect to *the right of a tender offeror* to claim damages for statutory violations by his adversary.   And our holding is premised on the belief that the harm done the defeated contestant is not that it had to pay more for the stock *but that it got less stock than it needed for control."*  480 F. 2d, at 362.   (Emphasis supplied.)

Moreover, the items of damages cited in dissent, *post,* at 57–58, n. 6, as attributable to Chris-Craft in its status as a Piper shareholder are, upon analysis, actually related *under these circumstances* to Chris-Craft's status as a contestant for control of a corporation.   First, the alleged "loss of the control premium," which Chris-Craft presumably otherwise would have enjoyed, relates on its face, not to Chris-Craft as a Piper shareholder *per se,* but to its status as a shareholder who failed to gain control.   Second, the alleged loss of value as to a "locked-in," "exceptionally large block" of Piper stock likewise relates under these circumstances to a particular kind of Piper shareholder, namely one whose efforts to secure control necessarily resulted in the acquisition of major stockholdings in the company.   In this regard, the Court of Ap-

---

[23] The dissent's approach fails to focus upon the precise goals served by the Williams Act, an indispensable inquiry under *Borak*.   Both Chris-Craft and Bangor Punta were, to be sure, Piper shareholders once each had embarked upon an attempt to gain control of the target company.   But neither offeror-bidder stood in the shoes of the Act's intended beneficiaries.   "[T]his bill is [designed] to provide the investor, *the person who is required to make a decision,* an opportunity to examine and to assess the relevant facts . . . ."   Senate Hearings 15.   (Emphasis supplied.)   In short, the dissent overlooks the fact that in no meaningful sense was either Chris-Craft or Bangor Punta, as a tender offeror, a "target shareholder" of Piper.

peals plausibly assumed that in order to dispose of its Piper holdings Chris-Craft would have to file a registration statement with the SEC, since Chris-Craft would presumably be engaged in a distribution of Piper stock. 516 F. 2d, at 188–189. In contrast, no ordinary Piper shareholder would have had to comply with the 1933 Act's registration requirements in order to sell his stock, since the typical shareholder is not "an issuer, underwriter, or dealer." 15 U. S. C. § 77d (1).

Consequently, the elements of damages mentioned in dissent are peculiar to Chris-Craft not as a "target shareholder" of Piper, but as a defeated tender offeror "injured" by its adversaries' alleged violations of the securities laws.[24]

## B

Our conclusion as to the legislative history is confirmed by the analysis in *Cort* v. *Ash*, 422 U. S. 66 (1975). There, the Court identified four factors as "relevant" in determining whether a private remedy is implicit in a statute not expressly providing one. The first is whether the plaintiff is " 'one of the class for whose *especial* benefit the statute was enacted . . . .' " *Id.*, at 78. (Emphasis in original.) As previously indicated, examination of the statute and its genesis shows that Chris-Craft is not an intended beneficiary of the Williams Act, and surely is not one "for whose *especial* benefit the statute was enacted." *Ibid.* To the contrary, Chris-Craft is a member of the class whose activities Congress intended to regulate for the protection and benefit of an entirely distinct class, shareholder-offerees. As a party whose previously unregulated conduct was purposefully brought under federal control by the statute, Chris-Craft can scarcely lay claim to the status of "beneficiary" whom Congress considered in need of protection.

---

[24] In light of our holding there is, of course, no occasion to pass on the Court of Appeals' underlying determination that petitioners actually violated the securities laws in their efforts to defeat Chris-Craft's bid. See also *infra*, at 43 n. 30.

Second, in *Cort* v. *Ash* we inquired whether there was "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one." *Ibid.* Although the historical materials are barren of any express intent to deny a damages remedy to tender offerors as a class, there is, as we have noted, no indication that Congress intended to create a damages remedy in favor of the loser in a contest for control. Fairly read, we think the legislative documents evince the narrow intent to curb the unregulated activities of tender offerors. The expression of this purpose, which pervades the legislative history, negates the claim that tender offerors were intended to have additional weapons in the form of an implied cause of action for damages, particularly if a private damages action confers no advantage on the expressly protected class of shareholder-offerees, a matter we discuss later. *Infra,* at 39.

Chris-Craft argues, however, that Congress intended standing under § 14 (e) to encompass tender offerors since the statute, unlike § 10 (b), does not contain the limiting language, "in connection with the purchase or sale" of securities. Instead, in § 14 (e), Congress broadly proscribed fraudulent activities "in connection with any tender offer . . . or any solicitation . . . in opposition to or in favor of any such offer. . . ."

The omission of the purchaser-seller requirement does not mean, however, that Chris-Craft has standing to sue for damages under § 14 (e) in its capacity as a takeover bidder. It may well be that Congress desired to protect, among others, shareholder-offerees who decided not to tender their stock due to fraudulent misrepresentations by persons opposed to a takeover attempt. See generally 1 A. Bromberg, Securities Law: Fraud § 6.3 (1021), p. 122.17 (1969). See also Senate Report 2; House Report 3. These shareholders, who might not enjoy the protection of § 10 (b) under *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723 (1975), could perhaps

state a claim under § 14 (e), even though they did not tender their securities.[25]   But increased protection, if any, conferred upon the class of shareholder-offerees by the elimination of the purchaser-seller restriction can scarcely be interpreted as giving protection to the entirely separate and unrelated class of persons whose conduct the statute is designed to regulate.

Third, *Cort* v. *Ash* tells us that we must ascertain whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff." 422 U. S., at 78.  We conclude that it is not.  As a disclosure mechanism aimed especially at protecting shareholders of target corporations, the Williams Act cannot consistently be interpreted as conferring a monetary remedy upon regulated parties, particularly where the award would not redound to the direct benefit of the protected class.  Although it is correct to say that the $36 million damages award indirectly benefits those Piper shareholders who became Chris-Craft shareholders when they accepted Chris-Craft's exchange offer, it is equally true that the damages award injures those Piper shareholders who exchanged their shares for Bangor Punta's stock and who, as Bangor Punta shareholders, would necessarily bear a large part of the burden of any judgment against Bangor Punta. The class sought to be protected by the Williams Act are the shareholders of the *target* corporation; hence it can hardly be said that their interests as a class are served by a judgment in favor of Chris-Craft and against Bangor Punta.  Moreover, the damages are awarded to the very party whose activities Congress intended to curb; Chris-Craft did not sue in the capacity of an injured Piper shareholder, but as a defeated tender offeror.

Nor can we agree that an ever-present threat of damages against a successful contestant in a battle for control will provide significant additional protection for sharehold-

---

[25] These cases, of course, do not present that issue, and we express no view on it.

ers in general. The deterrent value, if any, of such awards can never be ascertained with precision. More likely, however, is the prospect that shareholders may be prejudiced because some tender offers may never be made if there is a possibility of massive damages claims for what courts subsequently hold to be an actionable violation of § 14 (e).[26] Even a contestant who "wins the battle" for control may well wind up exposed to a costly "war" in a later and successful defense of its victory. Or at worst—on Chris-Craft's damages theory—the victorious tender offeror or the target corporation might be subject to a large substantive judgment, plus high costs of litigation.

In short, we conclude that shareholder protection, if enhanced at all by damages awards such as Chris-Craft contends for, can more directly be achieved with other, less drastic means more closely tailored to the precise congressional goal underlying the Williams Act.

Fourth, under the *Cort* v. *Ash* analysis, we must decide whether "the cause of action [is] one traditionally relegated to state law . . . ." 422 U. S., at 78. Despite the pervasiveness of federal securities regulation, the Court of Appeals concluded in these cases that Chris-Craft's complaint would give rise to a cause of action under common-law principles of interference

---

[26] The liability of the Piper family petitioners is instructive in this regard. Several able federal judges, including District Judges Tenney and Pollack and Chief Judge Lumbard of the Second Circuit, have expressly concluded that the Piper defendants did *not* violate the securities laws in their efforts to defeat Chris-Craft's bid. Judge Mansfield, while of the view that the Pipers had violated § 14 (e), was convinced that their violations had not caused injury to Chris-Craft. The legal uncertainties that inevitably pervade this area of the law call into question whether "deterrence" of § 14 (e) violations is a meaningful goal, except possibly with respect to the most flagrant sort of violations which no reasonable person could consider lawful. Such cases of flagrant misconduct, however, are not apt to occur with frequency, and to the extent that the violations are obvious and serious, injunctive relief at an earlier stage of the contest is apt to be the most efficacious form of remedy.

with a prospective commercial advantage. Although Congress is, of course, free to create a remedial scheme in favor of contestants in tender offers, we conclude, as we did in *Cort* v. *Ash*, that "it is entirely appropriate in this instance to relegate [the offeror-bidder] and others in [that] situation to whatever remedy is created by state law," *id.*, at 84, at least to the extent that the offeror seeks damages for having been wrongfully denied a "fair opportunity" to compete for control of another corporation.

## C

What we have said thus far suggests that, unlike *J. I. Case Co.* v. *Borak, supra,* judicially creating a damages action in favor of Chris-Craft is unnecessary to ensure the fulfillment of Congress' purposes in adopting the Williams Act. Even though the SEC operates in this context under the same practical restraints recognized by the Court in *Borak,* institutional limitations alone do not lead to the conclusion that any party interested in a tender offer should have a cause of action for damages against a competing bidder.[27] First,

---

[27] The dissent suggests that the SEC's "intimate involvement in the passage of the Act, entitle[s] its views to respect." *Post,* at 64. We note, first, that the present position of the SEC is not consistent with the testimony of the SEC Chairman in the legislative evolution of § 14 (e). Even if the agency spoke with a consistent voice, however, its presumed "expertise" in the securities-law field is of limited value when the narrow legal issue is one peculiarly reserved for judicial resolution, namely whether a cause of action should be implied by judicial interpretation in favor of a particular class of litigants. Indeed, in our prior cases relating to implied causes of action, the Court has understandably not invoked the "administrative deference" rule, even when the SEC supported the result reached in the particular case. *J. I. Case Co.* v. *Borak,* 377 U. S. 426 (1964); *Superintendent of Ins.* v. *Bankers Life & Cas. Co.,* 404 U. S. 6 (1971). That rule is more appropriately applicable in instances where, unlike here, an agency has rendered binding, consistent, official interpretations of its statute over a long period of time. *E. g., United States* v. *National Assn. of Securities Dealers,* 422 U. S. 694, 719 (1975); *Udall* v. *Tallman,* 380 U. S. 1, 16–17 (1965).

as Judge Friendly observed in *Electronic Specialty Co.* v. *International Controls Corp.*, 409 F. 2d 937, 947 (CA2 1969), in corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits, "is the time when relief can best be given." Furthermore, awarding damages to parties other than the protected class of shareholders has only a remote, if any, bearing upon implementing the congressional policy of protecting shareholders who must decide whether to tender or retain their stock.[28]   Indeed, as we suggested earlier, a damages award of this nature may well be inconsistent with the interests of many members of the protected class and of only indirect value to shareholders who accepted the exchange offer of the defeated takeover contestant.

We therefore conclude that Chris-Craft, as a defeated tender offeror, has no implied cause of action for damages under § 14 (e).

## V

In addition to its holding under § 14 (e), the Court of Appeals held that Bangor was liable for damages under Rule 10b–6 because of its off-exchange cash purchases of Piper stock in May 1969. Although the Court of Appeals imposed joint and several liability upon all defendants with respect to the injury occasioned by Bangor's achieving control of Piper, our holding in Part IV, *supra*, that no cause of action for damages lies under § 14 (e) in favor of Chris-

---

[28] Our holding is a limited one.   Whether shareholder-offerees, the class protected by § 14 (e), have an implied cause of action under § 14 (e) is not before us, and we intimate no view on the matter.   Nor is the target corporation's standing to sue in issue in this case.   We hold only that a tender offeror, suing in its capacity as a takeover bidder, does not have standing to sue for damages under § 14 (e).

Our precise holding disposes of many observations made in dissent. Thus, the argument with respect to the "exclusion" from standing for "persons most interested in effective enforcement," *post*, at 62, is simply unwarranted in light of today's narrow holding.

Craft, necessarily removes all petitioners except Bangor Punta from any potential liability in these cases. The issue that remains is whether Chris-Craft has a cause of action for damages against Bangor alone by virtue of the latter's alleged Rule 10b–6 violations. We hold that it does not.

Rule 10b–6 [29] is an antimanipulative provision designed to protect the orderliness of the securities market during distributions of stock. The Rule in essence prohibits issuers whose stock is in the process of distribution from market tampering by purchasing either the stock or rights to purchase the stock until the distribution has been completed. The purpose of the Rule is to prevent stimulative trading by an issuer in its own securities in order to create an unnatural and unwarranted appearance of market activity. See generally E. Aranow & H. Einhorn, Tender Offers for Corporate Control 131 (1973). Here, the Court of Appeals held, and its holding is unchallenged, that the cash purchases of Piper stock during the pendency of Bangor's exchange offer constituted purchases of "right[s] to purchase" Bangor stock within the meaning of Rule 10b–6.[30]

Without questioning the finding of Rule 10b–6 violations, Bangor strenuously argues that Chris-Craft fails the standing test applied in *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723 (1975).[31] The concern of Rule 10b–6 in these circumstances, Bangor suggests, is to foreclose manipulative trading which would affect the price of Bangor Punta stock, since Bangor Punta securities were being distributed

---

[29] Rule 10b–6 is set forth in part in n. 2, *supra.*

[30] We therefore have no occasion to consider whether the cash purchases by Bangor actually violated Rule 10b–6, and we express no view on that question. The issue is of secondary importance, since Rule 10b–13 now expressly covers this type of transaction.

[31] In *Blue Chip,* we applied the *Birnbaum* rule, *Birnbaum* v. *Newport Steel Corp.,* 193 F. 2d 461 (CA2), cert. denied, 343 U. S. 956 (1952), which limited standing under Rule 10b–5 to purchasers or sellers of securities.

in the exchange offer. Because Chris-Craft neither purchased nor sold Bangor securities, it is foreclosed, under Bangor's analysis, from suing under Rule 10b–6.

If we accepted Bangor's analysis, Rule 10b–6 would provide no remedy for an entire class of persons who actually purchased or sold securities, namely, those investors who either bought or sold Piper stock, which in turn represented "rights" to purchase Bangor stock then in distribution. This class of securities would, under the SEC's theory, be potentially affected by Bangor's off-exchange purchases, since acquisitions of rights to acquire stock during a distribution have, under the SEC's view of Rule 10b–6, at least the potential for artificially raising the price of those rights. Thus, Bangor's theory would foreclose, among others, any investors who purchased Piper stock after the unlawful acquisitions; this would be true even though the price paid for the stock might be shown to reflect the stimulative effects of Bangor's off-market, block purchases. In this respect, this case is readily distinguishable from *Blue Chip,* where the complainants made no purchases of stock at all; unlike that situation, here Chris-Craft was a purchaser of Piper common stock, the very class of securities with respect to which Bangor was held to have committed Rule 10b–6 violations.

We conclude, however, that these cases do not call for a definitive resolution of the law of standing under Rule 10b–6, as Bangor would have us do. Nor do we find it appropriate to do so under the unusual circumstances presented here. First, the Court of Appeals, although sensitive to the *Birnbaum* issue, did not have the benefit of our decision in *Blue Chip* in resolving the standing issue. Second, in this Court both Chris-Craft·and the United States, in its *amicus* brief on certiorari, contend that § 14 (e)'s broad prohibition of "manipulative acts or practices" in tender offers embraces acts proscribed under the more specific mandate of Rule 10b–6. Brief for Respondent 56; Brief for United States as

*Amicus Curiae* 16–17. Thus, to this extent the issue of Rule 10b–6 standing has not been fully explored by the parties, because of their initial misconception as to Chris-Craft's standing to sue for damages under § 14 (e).

Although we reserve judgment on the broader standing issues arising under Rule 10b–6, we hold that, in the context of these cases, Chris-Craft is without standing to sue for damages on account of Bangor's alleged Rule 10b–6 violations. Our holding is based upon one critical factor: As the parties themselves have framed the issues for resolution in this litigation, Chris-Craft is clearly outside the express concern of Rule 10b–6. At no time has Chris-Craft complained of or even suggested that the price which it paid for Piper shares was influenced by Bangor's Rule 10b–6 violations. Indeed, Chris-Craft does not assert standing as a *Piper shareholder;* on the contrary, it claims damages because, in its view of the case, it lost the opportunity to gain control of Piper by virtue of Bangor's Rule 10b–6 violations. Assuming the correctness of this theory, the fact remains that Rule 10b–6 is not directed at or concerned with contests for corporate control. This technical rule is focused narrowly upon a precise goal—maintaining an orderly market for the distribution of securities free from artificial or manipulative influences. Thus, as the issues have been framed, Chris-Craft did not come to the courts in the posture of a hoodwinked investor victimized by market manipulation; its complaint, as we noted, is that it lost a chance to gain control of a corporation, a claim beyond the bounds of the specific concern of Rule 10b–6.

Our conclusion in this respect is buttressed by the close relationship of Rule 10b–6 with § 9 of the 1934 Act, 15 U. S. C. § 78i. Section 9, among other things, prohibits transactions by issuers in their own securities, if forbidden by SEC regulations, even though the transactions are designed to stabilize the market for the issuer's stock. § 78i (a)(6). The SEC suggests in its *amicus* brief that Rule

10b–6 was promulgated pursuant to the Commission's authority under § 9 (a)(6),[32] as well as under §10 (b) of the 1934 Act. It contends that, in view of this bifurcated statutory origin, Chris-Craft need only be a purchaser of Piper stock to have standing under Rule 10b–6, since § 9 requires only that an aggrieved party have purchased or sold "any security" affected by the violation. 15 U. S. C. § 78i (e). Under this view, Chris-Craft's failure to purchase Bangor Punta stock is irrelevant, since its purchases of Piper shares satisfied the "any security" requirement of § 9.

Unlike § 10 (b), however, § 9 provides an express cause of action for persons injured by unlawful market activities. 15 U. S. C. § 78i (e). Yet, that cause of action is framed specifically in favor of "any person who shall purchase or sell any security *at a price which was affected by such act or transaction . . . ." Ibid.* (Emphasis supplied.) Congress therefore focused in § 9 upon the amount actually paid by an investor for stock that had been the subject of manipulative activity. This is not, as we have seen, the gravamen of Chris-Craft's complaint. It seeks no recovery for an improper premium exacted for Piper stock; rather it desires compensation for its lost opportunity to control Piper. We therefore conclude that, on its claimed basis for relief, Chris-Craft cannot avail itself of Rule 10b–6.

---

[32] Section 9 (a)(6) provides:

"(a) It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange—

"(6) To effect either alone or with one or more other persons any series of transactions for the purchase and/or sale of any security registered on a national securities exchange for the purpose of pegging, fixing, or stabilizing the price of such security in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

## VI

Our resolution of these issues makes it unnecessary to address the other questions raised by the parties in their petitions for certiorari. Since we have concluded that Chris-Craft cannot avail itself of § 14 (e) or Rule 10b–6 in its suit for damages, it is unnecessary to consider the Court of Appeals' holdings with respect to scienter, causation, the calculation of damages, the imposition of joint and several liability, the liability of underwriters in § 14 (e) damages actions, and the award of prejudgment interest.

Apart from awarding damages, however, the Court of Appeals also ordered the District Court to enjoin Bangor Punta from voting the illegally acquired Piper shares for a period of five years. In compliance with that directive, Judge Pollack on remand entered an injunction to remain in effect for a period of five years from November 12, 1974, the date on which judgment was entered. 384 F. Supp., at 528–529. On appeal, the Court of Appeals affirmed that portion of the District Court's order.

We hold that, under the circumstances presented here, this injunction should not have been granted. As we previously indicated, Chris-Craft prior to the trial on liability expressly waived any claim to injunctive relief. The case was tried in the District Court, without a jury, exclusively as a suit for damages. See 337 F. Supp., at 1136 n. 8, 1137, 1141–1142, n. 18, 1146. Accord, 480 F. 2d, at 355, 379. Under these circumstances, our holding that Chris-Craft does not have a cause of action for damages under § 14 (e) or Rule 10b–6 renders that injunction inappropriate, premised as it was upon the impermissible award of damages.[33] The inap-

---

[33] We intimate no view upon whether as a general proposition a suit in equity for injunctive relief, as distinguished from an action for damages, would lie in favor of a tender offeror under either § 14 (e) or Rule 10b–6.

propriateness of the injunction is particularly acute in this litigation, where the order was entered almost four years after the contest for control had ended and where no regard was given to the interests of the protected class of shareholder-offerees, many of whom would be at least indirectly disadvantaged by the award.[34]

Accordingly, the judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE BLACKMUN, concurring in the judgment.

I concur in the judgment. For the reasons set out in MR. JUSTICE STEVENS' dissenting opinion, *post,* p. 53, I am willing to begin with the premise that respondent Chris-Craft had "standing" in the sense that it possessed an implied right to sue under § 14 (e) of the Securities Exchange Act of 1934, 15 U. S. C. § 78n (e). Unlike the dissenters, however, I do not conclude, from this, that the Court of Appeals' judgment as to liability is to be affirmed. Since I am of the opinion that respondent failed to prove that petitioners' violations of the securities laws caused its injury, I agree with the Court that the judgment below should be reversed.[1]

---

[34] The fact that the parties did not separately enumerate the injunction issue in their petitions for certiorari does not preclude review. The Court has in the exercise of its discretion traditionally examined matters of importance not specifically assigned as error by the parties. *E. g., Carpenters* v. *United States,* 330 U. S. 395, 412 (1947); *Sibbach* v. *Wilson & Co.,* 312 U. S. 1, 16 (1941); *Mahler* v. *Eby,* 264 U. S. 32, 45 (1924). Cf. this Court's Rule 40 (d)(2); *Oregon ex rel. State Board* v. *Corvallis Sand & Gravel Co.,* 429 U. S. 363 (1977); *Mapp* v. *Ohio,* 367 U. S. 643 (1961). Exercise of this discretion is called for under these unusual circumstances, since a sweeping equitable remedy was ordered by the Court of Appeals to supplement an improper award of damages.

[1] Like the dissenters, I also accept the premise that the petitioning defendants violated § 14 (e) and Rule 10b–6.

## I

For the sake of clarity, it is useful to review briefly the acts that constituted violations of the securities laws and to identify the violators.

Three violations of § 14 (e) were isolated by the District Court and the Court of Appeals. The first occurred when W. T. Piper, Jr., wrote the letter of January 27 to the Piper shareholders and therein described the Chris-Craft offer as "inadequate and not in the best interests of Piper's shareholders." Petitioner First Boston reviewed that letter. Chris-Craft alleged that the description of its offer was a misstatement of material fact. In addition, the letter omitted to reveal First Boston's opinion that the price Chris-Craft was offering for Piper shares was fair, and it failed to disclose the pending negotiations with Grumman Aircraft Corporation.

The second § 14 (e) violation occurred with the Piper press release and letter to its shareholders on January 29. The sins in this instance were those of omission: Although the release and letter discussed the agreement with Grumman, they were silent about Grumman's option to return the shares to Piper at cost plus interest, and about Piper's obligation to keep the sale proceeds in a separate fund free from liens.

Finally, the courts determined that petitioners Bangor Punta and First Boston omitted to state a material fact relating to the value of the Bangor & Aroostock Railroad (BAR) in the financial statements filed in connection with Bangor's exchange offer. Specifically, the papers did not reveal that Bangor had been offered only $5 million for the sale of BAR, in the face of the facts that BAR was carried on Bangor's books at $18.4 million, and that no other offer appeared to be forthcoming.

In addition to these § 14 (e) violations, the courts found that Bangor had not complied with Securities and Exchange Commission Rule 10b–6, 17 CFR § 240.10b–6 (1976). This

occurred when Bangor in May 1969 made its three privately negotiated large purchases of Piper stock, while awaiting the effective date of its exchange offer.

This summary reveals that, on the accepted premises, the Pipers were guilty both of misstatements of material facts and of omissions; that Bangor violated § 14 (e) by omitting to state material facts; that Bangor violated Rule 10b–6 by its purchases of the large blocks of Piper stock; and that First Boston, like Bangor, omitted to reveal material facts, both in connection with the Piper letters and with regard to the BAR negotiations.

## II

Standards for proving causation in a securities law case were established in *Mills* v. *Electric Auto-Lite Co.*, 396 U. S. 375 (1970), and in *Affiliated Ute Citizens* v. *United States,* 406 U. S. 128 (1972). It must be shown that the misstatement or omission is "material." That term most recently has been defined by this Court to mean that "the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc.* v. *Northway, Inc.,* 426 U. S. 438, 449 (1976). Assuming that materiality is established, *Mills* held that causation would be proved if the misleading proxy solicitation at issue there was an "essential link in the accomplishment of the transaction." 396 U. S., at 385.

Because cases involving omissions create difficult problems of proof of reliance, and hence causation, the Court elaborated on the *Mills* test in *Affiliated Ute Citizens:*

> "Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. . . . This obligation to disclose and this withholding of a material

fact establish the requisite element of causation in fact."
406 U. S., at 153–154.

*Affiliated Ute Citizens,* of course, did not abolish the requirement of causation in failure-to-disclose cases. It simply provided the causal link between the omission of material information and the shareholder's act of purchasing or selling stock.

In the case of a suit by a tender offeror to recover damages suffered as a result of securities law violations by its competitors, causation is a far more complex issue. It is not enough for the offeror to prove that the competitor's violations caused the shareholders of the target corporation to act in a certain way. In addition, the offeror must show that the shareholders' reactions to the misstatements or omissions caused the injury for which it demands remuneration. Even though the *Mills-Affiliated Ute Citizens* presumption satisfies the requirements for proof of the first element of causation, the absence of any evidence that the violations might have altered the outcome of the contest for control would leave me unable to hold that the securities law violations caused the disappointed contestant's ultimate injury—its failure to acquire control of the target corporation.

### III

Applying these principles to the present litigation, I cannot say that respondent proved that the actions of any of the petitioners caused its injury. The Pipers were guilty of misstatements in the letters and press releases that they issued and of omissions in those materials. With regard to both their misstatements and omissions, the most that can be presumed is that more of the Piper shareholders would have tendered to Chris-Craft in January, when the violations occurred. To go further, and to assume that Chris-Craft would have acquired enough more shares to succeed in its contest for control, is simply contrary to the facts. The Chris-Craft offer was completely successful, insofar as it invited tender for

300,000 shares and 304,606 shares were eventually tendered. Furthermore, the evidence was strong that Chris-Craft's financial resources had been strained to the limit. Bangor Punta had not even entered the contest for control as of January. It is just as likely that Chris-Craft would have been left with a substantial block of Piper shares and that the Piper family would have retained control of the company, given only the facts that existed at the time the Piper violations were committed. Under the circumstances, Chris-Craft failed to prove that the Piper actions caused the injury of which Chris-Craft complains.

Neither did Chris-Craft prove that any action of Bangor Punta or First Boston caused its injury. The reasons for rejecting the proof of causation as to the Pipers, with regard to the January violations, apply with equal force to First Boston's role in those letters and press releases. Slightly different considerations are relevant to the BAR negotiations. Because the information about the proposed sale was omitted from Bangor's registration materials, Bangor's financial position may have looked somewhat better than it actually was. But even if one presumes that the shareholders who tendered to Bangor would not have done so if they had known the truth, there is still no way of knowing what course the contest would have taken from that point onward. If the shareholders had a negative opinion of Chris-Craft's management, they might have elected to retain their shares and continue their own incumbent management. Or a third contestant might have appeared. Or Bangor might have secured cash to use for its acquisition program. These uncertainties demonstrate that even taking advantage of the *Mills-Affiliated Ute Citizens* presumption, a finding of causation of Chris-Craft's injury was far from logically compelled. It follows that neither Bangor nor First Boston may be held liable on account of the nondisclosure of the BAR negotiations.

Finally, Bangor's purchases of the large blocks of Piper stock must be considered. As to this, I find conclusive the

fact, noted by the Court, *ante,* at 45, that "[a]t no time has Chris-Craft complained of or even suggested that the price which it paid for Piper shares was influenced by Bangor's Rule 10b–6 violations." [2] If the price of the shares was uninfluenced, and sufficient shares were still held by the public to make control a real possibility for Chris-Craft, there was a failure to prove causation. Cf. *Rondeau* v. *Mosinee Paper Corp.,* 422 U. S. 49, 64 (1975).

For these reasons, I concur in the judgment of the Court.[3]

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN joins, dissenting.

The Williams Act was passed for the protection of investors. The threshold question in this case is whether the

---

[2] The Rule 10b–6 violations do not raise the question of disclosure or nondisclosure of material facts, since that Rule deals with market manipulation. Thus, on this feature, the *Mills-Affiliated Ute Citizens* presumptions do not even enter the case.

[3] The dissenters note that Chris-Craft's recovery included elements of damages that were not dependent on proof that it actually would have acquired control of Piper. Since I view the ultimate injury to be the frustration of Chris-Craft's efforts to obtain control of Piper, cf. opinion of the Court, *ante,* at 24, I think that the recovery should not have included elements unrelated to the failure to achieve control. Furthermore, even if the injury was merely the diminished opportunity for success, I would still find the proof of causation inadequate. Because Chris-Craft's January offer was a complete success, and its financial resources were practically exhausted, the presumption that more Piper shareholders would have tendered but for the violations committed by the Pipers and First Boston was rebutted. Similarly, the uncertainties surrounding the probable effect of the BAR omissions on the shareholders' decisions make it impossible to presume that Chris-Craft's chances of success were lessened by that violation. Finally, the fact that the price of Piper shares was uninfluenced by the alleged Rule 10b–6 violation negates the possibility of injury on a diminished-opportunity theory just as surely as on a failure-to-succeed theory. I would therefore find a failure to prove causation under either view of Chris-Craft's injury.

holder of a large block of stock who is seeking to retain
or to acquire control of a corporation is one of the investors
the statute was intended to protect.

The critical issue can be framed by concentrating on the
exchange offers in July 1969. The conclusion that Bangor
Punta's offer violated § 14 (e) is established by prior pro-
ceedings and is not now open for review.[1]  When that viola-
tion occurred, Chris-Craft owned 556,206 shares of Piper stock
and was attempting to acquire sufficient additional shares
to constitute control. As a result of Bangor Punta's viola-
tions, Chris-Craft claims that it was injured in two ways:
the value of its investment in Piper stock was impaired,[2] and
it lost the opportunity to purchase enough additional shares
to control Piper.[3]  The Court holds that Chris-Craft has no
"standing" to recover damages for either injury no matter

---

[1] This is the third chapter in the history of this monumental litigation.
There have been three trials, three appeals, and three groups of certiorari
petitions. Only the questions presented by the certiorari petitions granted
on April 5, 1976, 425 U. S. 910, are before us. For the purpose of
analyzing the standing issue, we must accept the premise that the petition-
ing defendants are guilty of violating § 14 (e) and Rule 10b-6.

[2] In ¶ 64 of its second amended complaint, Chris-Craft alleged: "The
foregoing acts and courses of conduct by the defendants . . . sharply
decreased the value of Chris-Craft's holdings in Piper . . . ." App. F-26.
In its opinion on liability, the Court of Appeals noted: "The specific
injury sustained [by Chris-Craft] was a reduction in the value of [its]
Piper holdings . . . ." *Id.*, at A-60.

[3] Chris-Craft also alleged that "but for the unlawful acts of the
defendants described herein, Chris-Craft would have achieved control of
Piper," or at least would have paid less for stock it did acquire.
Second amended complaint ¶ 65, App. F-26. In view of these separate
allegations it is a little difficult to understand the suggestion, *ante*, at
35-37, that Chris-Craft is not suing for injuries sustained in its status as a
Piper shareholder. The fact that the Court of Appeals correctly regarded
Chris-Craft's status as a tender offeror as an adequate basis for relief does
not imply rejection of its claim as a shareholder, particularly since the
damages awarded by the Court of Appeals included compensation for the
impaired value of its Piper holdings.

how flagrant Bangor Punta's violation may have been, no matter how direct the causal connection between that violation and Chris-Craft's injury, and no matter how serious the injury. I disagree with this holding.

No one seriously questions the premise that Congress implicitly created a private right of action when it enacted § 14 (e) in 1968.[4] Also beyond serious question is the proposition that the members of the class which Congress was especially interested in protecting may invoke that private remedy and, further, that the shareholders of a target corporation are members of that class. The Court nevertheless holds that Chris-Craft may not recover because the protected class does not include tender offerors even though they may also be shareholders; and, at least implicitly, that to the extent Chris-Craft was injured in its status as a shareholder, its injury is not of a kind that the statute was intended to avoid. I am persuaded that both holdings are erroneous. I first consider Chris-Craft's status as a shareholder and then its rights as a tender offeror. Finally, I explain why my analysis is consistent with *Cort* v. *Ash*, 422 U. S. 66.

---

[4] Although originally one might have argued that the private remedies created by the Securities Acts are limited to those expressly described in the legislation itself, history has foreclosed any such argument today. The statutes originally enacted in 1933 and 1934 have been amended so often with full congressional awareness of the judicial interpretation of Rule 10b–5 as implicitly creating a private remedy that we must now assume that Congress intended to create rights for the specific beneficiaries of the legislation as well as duties to be policed by the SEC. This case therefore does not present the same kind of issue discussed in *Cort* v. *Ash*, 422 U. S. 66, namely, *whether* the statute created an implied private remedy. Rather, the question presented here is *who* may invoke that remedy. Nevertheless, it is noteworthy that none of the factors identified in the *Cort* opinion militates against implying a private cause of action in favor of Chris-Craft. Indeed, it is beyond dispute that here, as in *J. I. Case Co.* v. *Borak*, 377 U. S. 426, 431–433, the asserted private remedy would unquestionably aid the "primary goal" of the statute. See *Cort, supra,* at 85.

56

I

Shareholders of a target corporation may be injured by a fraudulent tender offer in two quite different ways. They may exchange their shares for an inadequate consideration in reliance on the misrepresentation. Or they may retain their shares and be harmed by the fact that other shareholders were induced to surrender control to unworthy newcomers. The legislative history of § 14 (e) persuades me that Congress intended to protect the shareholders from both of these potential harms.[5] Since Chris-Craft claims to

---

[5] In its discussion of the need for the legislation, the House Committee Report stated:

"The public shareholder must, therefore, with severely limited information, decide what course of action he should take. He has many alternatives. He can tender all of his shares immediately and hope they are all purchased. However, if the offer is for less than all the outstanding shares, perhaps only a part of them will be taken. In these instances, he will remain a shareholder in the company, under a new management which he has helped to install without knowing whether it will be good or bad for the company.

"The shareholder, as another alternative, may wait to see if a better offer develops, but if he tenders late, he runs the risk that none of his shares will be taken. He may also sell his shares in the market or hold them and hope for the best. Without knowledge of who the bidder is and what he plans to do, the shareholder cannot reach an informed decision. He is forced to take a chance. For no matter what he does, he does it without adequate information to enable him to decide rationally what is the best possible course of action. This is precisely the kind of dilemma which our Federal securities laws are designed to prevent.

"The competence and integrity of a company's management, and of the persons who seek management positions, are of vital importance to stockholders. Secrecy in this area is inconsistent with the expectations of the people who invest in the securities of publicly held corporations and impairs public confidence in securities as a medium of investment. H. R. Rep. No. 1711, 90th Cong., 2d Sess., 2–3 (1968) (hereinafter House Report).

"It was urged during the hearings that takeover bids should not be discouraged because they serve a useful purpose in providing a check

have suffered the latter type of harm,[6] it has asserted a cause of action created by the statute.

Section 14 (e) was patterned after § 14 (a), which regulates

on entrenched but inefficient management. It was also recognized that these bids are made for many other reasons, and do not always reflect a desire to improve the management of the company. The bill avoids tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid. It is designed to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case." *Id.*, at 4.

[6] Chris-Craft's recovery included damages for the impaired value of its holdings, measured by the loss of the control premium its stock would have commanded but for the defendants' violations, and by the additional loss of value resulting from its position as a locked-in holder of an exceptionally large block. These elements of damages relate only to the stock actually owned by Chris-Craft and therefore are distinguishable from damages suffered in its capacity as a tender offeror which are measurable by the loss of the opportunity to exercise control. It is not correct to characterize these items of damages as related only to Chris-Craft's status as a tender offeror. See *ante*, at 36–37. On the contrary, any owner of an equally large block would lose the control premium that block could previously have commanded on the market, and would suffer a further loss if the company had passed into hostile hands. For instance, members of the Piper family could have claimed damages of this kind if they had remained shareholders in Piper and Chris-Craft had illegally gained control.

The Court suggests that Chris-Craft should be denied standing because the damages it seeks are "actually related *under these circumstances* to Chris-Craft's status as a contestant for control . . . ." *Ante*, at 36 (emphasis in original). The italicized phrase may be intended to imply that a shareholder who was not also a tender offeror *could* recover these items of damages. If so, the Court fails to explain why a tender offeror should be denied like relief. The congressional goal of neutrality with respect to tender offers would be impaired if persons holding large control blocks were granted greater rights than tender offerors who challenge their control.

On the other hand, the Court may mean that a shareholder's damages recovery may not include elements attributable to the size of its holdings. (The remainder of this paragraph of the opinion lends itself to this interpretation by distinguishing between "typical," or "ordinary" share-

proxy contests.[7]  It is clear that a shareholder may recover in a suit under § 14 (a) even though he was not himself deceived by the misrepresentation.[8]  I do not understand why § 14 (e) should receive any narrower construction.[9]  At the very

holders, and owners of large blocks.)  This restriction on the damages recovery would be unsound.  There is no reason to think that Congress would have intended anything less than a "make whole" remedy for shareholders.  If I am correct that the purpose of the Williams Act was to protect the interests of shareholders, and others, in the integrity of the process of determining corporate control, see n. 5, *supra*, and *infra*, at 67–68, this kind of damages recovery could provide some measure of the value to the large shareholder of these interests.

[7] Both the Senate and the House Committee Reports refer to the cash tender offer as similar to a proxy contest.

[8] In *Mills* v. *Electric Auto-Lite Co.*, 396 U. S. 375, minority shareholders brought suit to set aside a merger on the ground that a proxy solicitation had been misleading.  The suit was brought before the merger; obviously the plaintiffs were then aware of the misrepresentation, and in fact they voted against the merger, 403 F. 2d 429, 435 (CA7 1968), which was consummated despite their votes.  This Court held that the minority shareholders were entitled to some relief, and while not specifying that relief, noted that "[m]onetary relief will, of course, also be a possibility." 396 U. S., at 388.  If the defect in the proxy solicitation related to a term of the merger, an accounting could be ordered so that the shareholders would "receive the value that was represented as coming to them"; otherwise, monetary relief would be available "if the merger resulted in a reduction of the earnings or earnings potential of their holdings." *Id.*, at 388–389.  This holding in *Mills* was consistent with the earlier statement in *J. I. Case Co.* v. *Borak*, 377 U. S. 426:

"The injury which a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation ordinarily flows from the damage done the corporation, rather than from the damage inflicted directly upon the stockholder.  The damage suffered results not from the deceit practiced on him alone but rather from the deceit practiced on the stockholders as a group." *Id.*, at 432.

[9] The tender offer is just one species of solicitation that either an incumbent or an outside group may use in a contest for control of a corporation.  Power to direct the destiny of the corporation may be obtained by acquiring proxies for a majority of the shares, by acquiring the shares themselves, or more typically by a combination of proxies and

least, the Court should allow all shareholders injured by a violation of § 14 (e) to assert a damages claim against the wrongdoer. Neither the extraordinary size of Chris-Craft's investment in Piper stock, nor the fact that the stock had been owned for only a few months, should deprive Chris-Craft of the right to assert a remedy available to the other members of the shareholder class which § 14 (e) was plainly designed to protect.

## II

Even if we disregard Chris-Craft's stock ownership in Piper and focus only on its status as a tender offeror, it remains clear to me that its legal rights were invaded by the defendants' violation of § 14 (e). This conclusion is compelled by (a) a fair evaluation of the legislative purpose in the light of the rationale of *J. I. Case Co.* v. *Borak,* 377 U. S. 426; and (b) respect for the opinions of the Securities and Exchange Commission and the numerous federal judges who have recognized that § 14 (e) is little more than a restatement of Rule 10b–5 unless it has broadened the class of potential litigants who may challenge defective cash tender offers to include rival contestants for control as well as shareholders.

## A

In *Borak* a unanimous Court held that the 1934 Act had implicitly authorized a shareholder to bring an action for rescission or damages for a violation of § 14 (a). Such a remedy was regarded as essential for the protection of investors [10] because practical considerations made it impos-

actual purchases. Section 14 broadly prohibits fraudulent solicitations, not merely to protect the individual shareholder from casting a misguided vote or from making an ill-advised sale, but more importantly to protect the corporate entity as a whole from the consequences of a vital decision procured by fraud.

[10] It is noteworthy that in the *Borak* opinion the Court consistently used the word "investors" rather than the word "shareholders" to describe the protected class.

sible for the SEC to enforce the proxy statement requirements completely and effectively.[11]  This practical concern applies with even greater force to tender offers which are processed on a highly expedited schedule.[12]

---

[11] "The injury which a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation ordinarily flows from the damage done the corporation, rather than from the damage inflicted directly upon the stockholder.  The damage suffered results not from the deceit practiced on him alone but rather from the deceit practiced on the stockholders as a group.  To hold that derivative actions are not within the sweep of the section would therefore be tantamount to a denial of private relief.  Private enforcement of the proxy rules provides a necessary supplement to Commission action.  As in antitrust treble damage litigation, the possibility of civil damages or injunctive relief serves as a most effective weapon in the enforcement of the proxy requirements.  The Commission advises that it examines over 2,000 proxy statements annually and each of them must necessarily be expedited.  Time does not permit an independent examination of the facts set out in the proxy material and this results in the Commission's acceptance of the representations contained therein at their face value, unless contrary to other material on file with it.  Indeed, on the allegations of respondent's complaint, the proxy material failed to disclose alleged unlawful market manipulation of the stock of [the American Tractor Corp.] and this unlawful manipulation would not have been apparent to the Commission until after the merger.

"We, therefore, believe that under the circumstances here it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose."  377 U. S., at 432–433.

[12] "As initially introduced, the bill would have required the disclosure statement to be filed with the Securities and Exchange Commission 5 days before the tender offer was made to allow the staff of the Securities and Exchange Commission an opportunity to review the material for compliance with the applicable requirements.  At the hearings it was urged that this prior review was not necessary and in some cases might delay the offer when time was of the essence.  In view of the authority and responsibility of the Securities and Exchange Commission to take appropriate action in the event that inadequate or misleading information is disseminated to the public to solicit acceptance of a tender offer, the bill as approved by the committee requires only that the statement be on file with the Securities and Exchange Commission at the time the

In both proxy and tender offer contests, the remedy which will most effectively deter violations of the statute is unquestionably the private damages action.[13]   Under these circumstances, as the Court stressed in *Borak, supra,* "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose."   377 U. S., at 433.

If a private remedy must be implied to ensure full compliance with the statute, the remedy must be available to the litigants who are most vitally interested in effective enforcement.   This is the essence of the *Borak* holding which was given emphasis by its quotation from *Deckert* v. *Independence Corp.,* 311 U. S. 282, 288:

> " 'The power *to enforce* implies the power to make effective the right of recovery afforded by the Act.   And the power to make the right of recovery effective implies the power to utilize any of the procedures or actions normally available to the litigant according to the

tender offer is first made to the public."   S. Rep. No. 550, 90th Cong., 1st Sess., 4 (1967) (hereinafter Senate Report).

[13] In the passage from *Borak* set out in n. 11, the Court described the possibility of civil damages or injunctive relief as "a most effective weapon" in the enforcement of the Securities Exchange Act.   The efficacy of enforcement of the antitrust laws and the Civil Rights Acts by "private attorneys general" rests on precisely this premise.

For example, we have stated that cases rejecting the *in pari delicto* defense,

"were premised on a recognition that the purposes of the antitrust laws are best served by insuring that the private action will be an ever-present threat to deter anyone contemplating business behavior in violation of the antitrust laws.   The plaintiff who reaps the reward of treble damages may be no less morally reprehensible than the defendant, but the law encourages his suit to further the overriding public policy in favor of competition.   A more fastidious regard for the relative moral worth of the parties would only result in seriously undermining the usefulness of the private action as a bulwark of antitrust enforcement." *Perma Mufflers* v. *International Parts Corp.,* 392 U. S. 134, 139.

exigencies of the particular case.' " 377 U. S., at 433–434 (emphasis in original).

The potential litigants who have the most to gain from enforcement of the statute—and the most to lose if its provisions can be ignored with impunity—are plainly the rival contestants. Surely the contestants are in a much better position—and have a much greater incentive—than a mere shareholder to detect and to challenge conduct prohibited by the Williams Act. Once one recognizes that Congress intended to rely heavily on private litigation as a method of implementing the statute, it seems equally clear that Congress would not exclude the persons most interested in effective enforcement from the class authorized to enforce the new law. Nor does it seem logical to assume that such authority would only reach actions brought for the benefit of the shareholders. It is fundamental in our adversary system that the selfish interest of the litigant provides the best guarantee that a claim will be effectively asserted.[14] I see no reason to deny incumbent management the right to recover for its own losses as well as for such injuries as the shareholders may have suffered. After all, those insiders are often the specific target of the conduct that the statute was enacted to regulate.[15]

---

[14] This is the basis of the standing requirement in its constitutional aspect. See *Baker* v. *Carr*, 369 U. S. 186, 204. As one of the draftsmen of the 1934 Act put it, "there is no policeman so effective as the one whose pocketbook is affected by the degree to which he enforces the law." Stock Exchange Practices, Hearings on S. Res. 84 (72d Cong.) and S. Res. 56 and S. Res. 97 (73d Cong.) before the Senate Committee on Banking and Currency, 73d Cong., 2d Sess., pt. 15, National Securities Exchange Act of 1934, p. 6518 (1934).

[15] Consider the following testimony by Senator Kuchel, who described himself as a coauthor of the legislation:

"The competence and integrity of management and controlling persons are of vital importance to stockholders. And yet, the prospective purchasers on a cash tender offer need not and often do not reveal their

If management is included within the protected class, an outside tender offeror has an equally strong argument for inclusion. For the legislative history also indicates that Congress was concerned about misconduct by insiders as well as outsiders. And just as management will most effectively challenge violations by the invader, so it is equally clear that a company committed to an attempt to acquire control of a target company will be the most zealous guardian of the shareholders' interests in having management comply with the law. I find ample evidence of congressional interest in fair competition between outsiders and insiders in making and opposing tender offers to shareholders of the target company. That evidence persuades me that both contenders are included within the class of persons protected by § 14 (e).[16]

---

intentions, their commitments, or even their identities to the corporate shareholders. Not only is the shareholder prevented from making an informed investment decision, but both he and the corporation may easily become the unknowing victims of the so-called corporate raider.

"Today, there are those individuals in our financial community who seek to reduce our proudest businesses into nothing but corporate shells. They seize control of the corporation with unknown sources, sell or trade away the best assets, and later split up the remains among themselves.

"The tragedy of such collusion is that the corporation can be financially raped without the management or the shareholders having any knowledge of the acquisitions. Using the cash tender offer as a vehicle, the purchases can be made in so-called street names or, even more commonly, by Swiss banks for an undisclosed account number. The corporate raider may thus act under a cloak of secrecy in obtaining the shares needed to put him on the road to a successful capture and liquidation of the company." Hearings on S. 510 before the Subcommittee on Securities of the Senate Committee on Banking and Currency, 90th Cong., 1st Sess., 42–43 (1967).

[16] The use of terms such as "corporate raider" and "take-over pirate" in the argument of this case was misleading because they implied that the Williams Act was not intended to be neutral as between rival contestants for control. One thing that is abundantly clear from both the language of the statute and its legislative history is that the Act was *not* intended to tip the scales in favor of management.

## B

The lower courts, along with the SEC, have consistently taken a broad view of standing under § 14 (e).

In the appeal on liability in this case, the SEC's *amicus* memorandum in the Second Circuit argued that "if a rival company in a contest for corporate control has no standing to sue for violations of the securities laws, enforcement of recent Congressional legislation to assure fairness in such struggles will be hampered . . . ." Memorandum of SEC as *Amicus Curiae* in No. 72–1064 (CA2), p. 12. In its brief before this Court, the SEC continues to insist that "[e]ven more necessary [than in *Borak*] are such private rights of action to supplement Commission actions to effectuate the Congressional purposes in enacting the Williams Act," Brief for SEC as *Amicus Curiae* 12. It devotes a full 55 pages of its brief to arguing that providing a private remedy in this case is necessary to insure enforcement of the Act and is consistent with the congressional intent. The SEC's expertise in the securities field, and its intimate involvement in the passage of the Act, entitle its views to respect.

The Courts of Appeals have also taken an expansive view of standing under § 14 (e). Shortly after § 14 (e) was passed, for example, Judge Friendly pointed out that the section's only possible addition to existing case law was its possible impact on standing, and indicated that both non-tendering shareholders and the corporation have standing, *Electronic Specialty Co.* v. *International Controls Corp.*, 409 F. 2d 937, 940–941, 946 (CA2 1969). Accord, *Smallwood* v. *Pearl Brewing Co.*, 489 F. 2d 579, 596 (CA5 1974). In another Second Circuit case, the court commented that § 14 (e) "should serve to resolve any doubts about standing in the tender offer cases, even where an offeror is not . . . in the position of a forced seller." *Crane Co.* v. *Westinghouse Air Brake Co.*, 419 F. 2d 787, 798–799 (1969). In the present case, while the Court of Appeals judges disagreed sharply on

several issues, there was agreement on standing. Judge Mansfield, in his separate opinion, explained:

"The federal securities laws are silent on the subject of a private party's standing to sue. Indeed, neither § 14 (e) nor § 10 (b) or Rule 10b–5 state that purchasers, sellers, or exchangers of securities have the right to sue. However, their implied standing to sue has long since been judicially established . . . . I would recognize CCI's standing solely on the ground that vigorous enforcement of the anti-fraud provisions through private litigation . . . calls for similar implication of a private right of action in favor of a defeated contestant against the successful bidder for control for damages caused by the latter's violation of that section, . . . especially in view of our willingness to permit the target corporation to seek relief against the offeror under § 14 (e)." 480 F. 2d 341, 396 (CA2 1973). (Citations omitted.)

The First Circuit, relying heavily on these decisions, has also extended standing to obtain damages to tender offerors, *H. K. Porter Co.* v. *Nicholson File Co.,* 482 F. 2d 421, 424–425 (1973), and the Fifth Circuit has cited them with apparent approval. *Smallwood* v. *Pearl Brewing Co., supra,* at 596, and n. 20.[17]

---

[17] We have been referred to two cases as restricting standing under § 14 (e): *Klaus* v. *Hi-Shear Corp.,* 528 F. 2d 225, 232 (CA9 1975); *Sargent* v. *Genesco, Inc.,* 492 F. 2d 750 (CA5 1974). In both cases, however, there was no harmful misrepresentation to the protected shareholders. Hence, as the *Sargent* court noted, the issue was not "whether these plaintiffs were appropriate plaintiffs to enforce the duties created by [§] 14 (e)," but rather, whether those duties were violated. *Id.,* at 770 n. 28. In *Klaus,* it was the tender offeror who was misled. 528 F. 2d, at 232.

The commentators have supported the expansive view of standing under § 14 (e). See, *e. g.,* Bromberg, The Securities Law of Tender Offers, 15 N. Y. L. F. 459, 554 (1969); Hamilton, Some Reflections on Cash Tender Offer Legislation, 15 N. Y. L. F. 269, 291–292 (1969); Note,

66

## III

Petitioners view *Cort* v. *Ash,* 422 U. S. 66, as foreclosing standing in this case because tender offerors do not belong to the "especial class" Congress intended to benefit.   I am convinced, however, that the controlling authority is not *Cort,* but *J. I. Case Co.* v. *Borak, supra.*   In *Borak,* the Court held that a derivative suit on behalf of the corporation could be brought under § 14 (a), see 377 U. S., at 431, although it seems clear that the primary beneficiaries of that section were individual stockholders rather than corporations.   Thus, *Borak* itself does not meet the majority's "especial class" test.[18]   But *Cort* carefully distinguished *Borak* on grounds that apply equally to this case.   In this case, as in *Borak,* there is "at least a statutory basis for inferring that a civil cause of action of some sort lay in favor of someone," *Cort,* 422 U. S., at 79; see *id.,* at 79 n. 11; there is a "pervasive legislative scheme governing the relationship between the plaintiff class and the defendant class in a particular regard," *id.,* at 82; the private remedy is necessary to effectuate the congressional goal, *id.,* at 84; and that goal will accordingly be hindered if the plaintiff is relegated to an inadequate state remedy, *id.,* at 85.   Thus, in the kind of situation presented by

*Chris-Craft* and Loss of Opportunity to Control: The Lost Opportunity, 43 Ford. L. Rev. 820, 821 (1975); Comment, Remedies for Defrauded Tender Offerors Under Section 14 (e) of the Securities Exchange Act of 1934, 62 Geo. L. J. 1693, 1695–1696 (1974); Note, Cash Tender Offers, 83 Harv. L. Rev. 377, 398–399 (1969); Comment, Tender Offers: The Liberalization of Standing Requirements Under Section 14 (e), 7 U. San Fran. L. Rev. 561 (1973).

[18] The Court reads *Borak* as though it merely sustained class relief on behalf of all shareholders. *Ante,* at 32–33, and n. 21. The *Borak* opinion itself, however, is explicit in its holding that "a right of action exists as to both derivative and direct causes." 377 U. S., at 431. Even under the Court's interpretation of *Borak* as protecting *all* shareholders, I do not understand today's holding that only *some* Piper shareholders are protected—*i. e.,* "ordinary" shareholders as opposed to holders of large blocks.

*Borak* and this case, *Cort* does not require that the plaintiff belong to the "especial class" as one of four relevant factors to be considered; nowhere does it say that this factor is essential. And in discussing this factor, the Court suggested the existence of a "pervasive legislative scheme" as an alternative to an "articulated federal right in the plaintiff," *id.,* at 82. I conclude that *Cort* does not bar Chris-Craft's action, and that *Borak* remains a viable precedent. As shown in Part II–A, *supra, Borak* compels a holding that Chris-Craft has standing.

The "especial class" argument, besides being based on a misreading of *Cort* and *Borak,* is also based on the mistaken belief that congressional desire to protect shareholders is in some way inconsistent with providing tender offerors with a right to damages.

It is true that Congress was deeply concerned about the individual stockholder faced with a tender offer. Congress did not, however, view this shareholder's interest as being distinct from the interests of others affected by his decision. As noted in the discussion of Chris-Craft's standing as a shareholder, Congress also intended to protect those who would remain shareholders after the successful tender offer, *supra,* at 56–57, n. 5; see also *supra,* at 62–63, n. 15. Like these shareholders, the participants in the tender contest were seen as having an interest in the integrity of the process. Senator Williams, in explaining the purposes of the bill, stated:

> "I have taken extreme care with this legislation to balance the scales equally *to protect the legitimate interests of the corporation, management, and shareholders* without unduly impeding cash takeover bids. Every effort has been made to avoid tipping the balance of regulatory burden in favor of management or in favor of the offeror. The purpose of this bill is to require full and fair disclosure for the benefit of stockholders *while at the same time providing the offeror and management*

*equal opportunity to fairly present their case.*[19]   Experience . . . has amply demonstrated that the disclosure requirements of the Federal securities acts are an aid to legitimate business transactions, not a hindrance." 113 Cong. Rec. 854–855 (1967) (emphasis added).

"[This bill will put all on] an equal footing with respect to the availability of significant facts about a tender offer . . . .   All will be able to deal in the securities markets knowing that all of the pertinent facts are available." *Id.,* at 856.

Indeed, protection of tender offerors is not only consistent with protection of shareholders. It is also indispensable to protecting shareholders. Individual shareholders often lack the capacity to litigate these cases effectively. Few indeed could afford to pursue the course Chris-Craft has taken of hiring counsel with experience in complex litigation of this kind to litigate through a preliminary injunction, discovery, trial on liability, another trial on damages, three appeals to the Second Circuit, including an en banc, and three petitions to this Court. Thus, the most realistic deterrent to fraud on shareholders is a damages suit brought by the opposition in the tender contest. Moreover, disallowing such suits creates an incentive to violate the Act in retaliation for violations by the other side. When no effective judicial remedy is available, self-help is more attractive. Finally a damages remedy for the tender offeror is necessary for the protection of one particular class of shareholders: those shareholders of target corporations who accept an exchange offer and thereby become shareholders of the tender offeror. In the instant case, 112,089 Piper shares were tendered to Chris-Craft as part of an exchange offer effective July 24. The tendering shareholders took the risk that Chris-Craft might lose in a fair tender con-

---

[19] This language is also found in both the House and Senate Reports. House Report 4; Senate Report 3.

test. But they did not assume the risk that Bangor Punta would illegally deprive Chris-Craft of its opportunity to gain control. These shareholders are certainly within the especial class § 14 (e) was intended to protect. Only by making Chris-Craft whole can the expectations of these shareholders be vindicated.[20]

Petitioners' answer to all this is that an award of damages to Chris-Craft would harm the former Piper shareholders who exchanged their stock for Bangor Punta stock. This answer is unsatisfactory for three reasons. First, I am unpersuaded that the federal courts are incapable of structuring the remedy to avoid this problem. See *H. K. Porter Co.* v. *Nicholson File Co.,* 482 F. 2d 421, 425 (CA1 1973). Second, in many cases the problem will not arise, either because the size of the judgment will be small in relation to the defendants' assets, or because most or all of the tendering shareholders will have sold their stock by the time of the judgment. Third, the argument provides no basis for distinguishing between private plaintiffs. Any monetary recovery against Bangor Punta by any plaintiff potentially decreases the value of Bangor Punta's stock.[21]

---

[20] Because the injury to these shareholders "ordinarily flows from the damage done the corporation, rather than from the damage inflicted directly upon the stockholder," *Borak,* 377 U. S., at 432, it would be only a slight extension of *Borak* to allow these shareholders to bring a derivative action on behalf of Chris-Craft. Cf. *id.,* at 432–433. I would also allow Chris-Craft to bring the action.

[21] Petitioners' argument would thus bar a suit by a person who had tendered a large number of shares to Bangor Punta, since a recovery on his behalf could injure other former Piper shareholders. It would also bar one of the remaining public shareholders in Piper from suing, either in his own behalf or on behalf of Piper, for Bangor Punta's illegal acquisition of control. Likewise, it would bar suit by a Piper shareholder who exchanged his stock for Chris-Craft stock, in the reasonable and legally protected expectation that Chris-Craft would have a fair opportunity to acquire control of Piper. Petitioners' argument simply cuts too far.

In sum, in my judgment the disposition of the standing issue by the Court of Appeals for the Second Circuit was consistent with this Court's prior decisions as well as the unanimous view of other Circuits. The fact that error may have been committed in this litigation in the consideration of the liability and damages issues—or might be committed in other cases—should not be permitted to color the analysis of the threshold standing issue. On that issue—unless the basic policy of construing securities legislation liberally to protect investors, which motivated this Court's decisions in this area of the law for decades, is to be repudiated—a fair evaluation of the statute requires affirmance.

Since the Court does not address the other questions presented by the certiorari petitions, neither shall I. I must, however, register my additional dissent from the Court's action in volunteering to decide—and in deciding incorrectly—a question not raised by the parties. The Court's reversal of the injunction entered by the District Court pursuant to the direction of the Court of Appeals is, as far as I can determine, totally unprecedented.

I frankly do not understand the reasoning which leads the Court to conclude that the injunction was "premised" upon the damages award. *Ante,* at 47. The injunction was an independent remedy premised on the violations of law found by the lower courts. Setting aside the damages recovery provides an *additional* reason for permitting the injunction to remain in effect; surely that action does not logically support the conclusion that there should be no remedy whatsoever for violations which the Court assumes, *arguendo,* were properly proved.

My reading of the relevant portions of the record do not persuade me that Chris-Craft made a binding election to waive any right to equitable relief,[22] particularly since it

---

[22] The only material in the record which I have been able to locate and

must be kept in mind that all parties had assumed that a damages remedy was available.[23]  If there has been any relevant waiver, it is by the petitioners who did not challenge

which is relevant to this issue is the following colloquy from a pretrial conference on September 25, 1970:

"MR. LIMAN: That has nothing to do with us, your Honor. I am speaking of Chris-Craft. I think that the argument was made that they shouldn't have to pay this woman in part because we were seeking to enjoin them here [the record does not contain the complete transcript and it is unclear what this refers to], but in the light of the way in which they have managed this company for a year I'm not seeking injunctive relief here. It wouldn't do me any good here to get back Piper. I am seeking damages. As to that I don't think I have anything to do with this case now. You can pay that woman as far as I am concerned.

"MR. RYAN: Do I understand that to be an irrevocable position, Mr. Liman?

"MR. LIMAN: You can understand that I am seeking damages here." App. in No. 72–1064 (CA2), p. 1105A.

Two pages later, the following exchange took place:

"THE COURT: I thought that you wanted them to rescind 112,000 shares, the 112,000 share transaction.

"MR. LIMAN: I want money now, your Honor.

"THE COURT: I know you say that now. But the papers up to this point, and in the Court of Appeals talked about having Bangor Punta give back the 112,000 shares or tender or rescind.

"MR. LIMAN: Not these shares that were involved here. The shares they got in the exchange offer, yes, your Honor. And at that time Piper was worth getting. But we lost that injunction to keep them from exercising control over Piper and they have consolidated their position, and I just don't think, with all the powers that this Court has, you could give effective injunctive relief that would put me in the position that I should have been in in August of 1969. That's why money is the only thing that is left. . . ." *Id.*, at 1106A–1107A.

The position taken by Chris-Craft's counsel in the Court of Appeals was as follows:

"It is very difficult to conceive of how we can be put in a position to ever compete with Bangor Punta for control again particularly since they owned the swing blocks. If we were directed to sell them as the seller,

the injunction in this Court.[24]   In reaching out to decide this unargued question, the Court takes a liberal view of the "plain error" doctrine which I consider unacceptable.

Accordingly, without explaining my views about the issues not decided by the Court,[25] I respectfully dissent from its judgment.

---

they could afford to buy them at any price since they were buying their own stock.

"So there were such practical difficulties in attempting to work out an equitable decree after two years in a frozen out minority position that a relief in which they were told paid for the shares now, 'You have done everything else to them,' seemed to be the most appropriate.

"However, if for any reason we are told that money damages are not appropriate in this case then we need equitable relief of some sort that will restore us to what we had lost the opportunity to do, which was, namely, control of Piper."   Tr. of Oral Arg. in No. 72–1064 (CA2), p. 9. Somewhat later in argument, counsel repeated:

"I think that there is equitable relief that could be fashioned.   Bangor Punta could be enjoined from voting the controlled shares.   That would have the effect of putting Chris-Craft in a controlling position and they, of course, object very much to that."   *Id.,* at 16.

[23] In its memorandum in opposition to Chris-Craft's motion for a preliminary injunction, Bangor Punta made this statement, pp. 24–25: "Even assuming Chris-Craft can prove the allegations in its moving papers at a full trial after Bangor Punta has had the opportunity of properly preparing itself for trial, a money judgment will fully compensate Chris-Craft for any damages it allegedly suffered because the Public holders of the 107,574 shares elected to go with Bangor Punta."

[24] Indeed, counsel for Bangor Punta expressly stated at oral argument that a tender offeror's standing to seek injunctive relief under § 14 (e) was unchallenged.   Tr. of Oral Arg. 12.

[25] On the issue of causation, I would simply note that Chris-Craft's recovery includes elements of damages which were not dependent on proof that it would have acquired actual control but for petitioners' violations.   And I should also note that I would not affirm the Court of Appeals' calculation of the total damages award.